Nelson Bunker **HUNT**, W. Herbert Hunt and Lamar Hunt, Plaintiffs,

v.

**MOBIL OIL CORPORATION**, Texaco, Inc., Standard Oil Company of California, The British Petroleum Company, Ltd., Shell Petroleum Company, Ltd., Exxon Corporation, Gulf Oil Corporation, Occidental Petroleum Corporation, Grace Petroleum Corporation, and Gelsenberg A. G., Defendants.

**75 Civil 1160.**

United States District Court, S. D. New York.

Oct. 12, 1978.

Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, Hirschkop & Grad, P. C., Alexandria, Va., for plaintiffs; Daniel P. Levitt, Ellen R. Nadler, Kenneth Berlin, Jeffrey T. Golenbock, Philip J. Hirschkop, New York City, of counsel.

Howrey & Simon, Washington, D. C., Richard H. Zahm, Jr., Juliet Shepard, S. J. Bird, Mobil Oil Corp., New York City, for defendant Mobil Oil Corp.; Edward F. Howrey, A. Duncan Whitaker, Mark D. Wegener, Bruce A. Deerson, Washington, D. C., of counsel.

Charles F. Kazlauskas, Jr., Lawrence R. Jerz, G. Kenneth Handley, Texaco, Inc., White Plains, N. Y., Kaye, Scholer, Fierman, Hays & Handler, New York City, for

defendant Texaco Inc.; Milton Handler, Milton J. Schubin, Randolph S. Sherman, New York City, of counsel.

Lord, Day & Lord, New York City, Pillsbury Madison & Sutro, San Francisco, Cal., for Standard Oil Co. of California; Gordon B. Spivack, John W. Castles, III, Harry G. Sklarsky, David H. Marks, Carolyn T. Ellis, New York City, Richard J. MacLaury, Turner H. McBaine, Wallace L. Kaapcke, Thomas E. Haven, San Francisco, Cal., of counsel.

Shea Gould Climenko & Casey, New York City, for defendant The British Petroleum Co., Ltd.; Bruce A. Hecker, Joseph Ferraro, Richard F. Czaja, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant Shell Petroleum Co., Ltd.; John R. Hupper, Douglas D. Broadwater, Thomas J. Sweeney, III, Thomas J. Dougherty, New York City, of counsel.

Sullivan & Cromwell, Albert P. Lindemann, Jr., Exxon Corp., New York City, for defendant Exxon Corp.; Robert MacCrate, Robert M. Osgood, H. Lake Wise, Elizabeth McLain Olmsted, Barbara A. Mentz, New York City, of counsel.

John E. Bailey, Charles O. Murray, III, A. Randall Friday, Gulf Oil Corp., Houston, Tex., Frank W. Morgan, Frank R. O'Hara, Gulf Oil Corp., Pittsburgh, Pa., for defendant Gulf Oil Corp.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Occidental Petroleum Corp.; Louis Nizer, Robert R. Salman, Michael Dore, Walter S. Beck, New York City, of counsel.

Leo Larkin, Morris Handel, Grace Petroleum Corp., New York City, for defendant Grace Petroleum Corp.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge:

This antitrust suit, involving claims and counterclaims for hundreds of millions of dollars among some of the world's largest oil companies, arises out of events in the Middle East, particularly Libya, in the early 1970's. Plaintiffs are three brothers: Nelson Bunker Hunt, W. Herbert Hunt and Lamar Hunt, who as partners owned a concession in Libya for the exploration, development and production of crude oil.[1] The defendants are: Mobil Oil Corporation ("Mobil"); Texaco, Inc. ("Texaco"); Standard Oil Company of California ("Socal"); The British Petroleum Company, Ltd. ("BP"); Shell Petroleum Company, Ltd. ("Shell"); Exxon Corporation ("Exxon"); and Gulf Oil Corporation ("Gulf").[2] All the defendants, save Gulf, had production in Libya, and each also owned concessions with substantial production in the Persian Gulf nations. The defendants are herein referred to as the "major oil companies," the "majors" or "Persian Gulf producers." Other companies that owned and operated oil concessions in Libya included Occidental Petroleum Corporation ("Occidental"), Grace Petroleum Corporation ("Grace"), Gelsenberg A.G. ("Gelsenberg"), Amerada Hess ("Amerada Hess" or "Hess"), Atlantic Richfield Company ("ARCO"), Continental Oil Company ("Continental") and Marathon Oil Company ("Marathon"). These companies and Hunt are generally referred to as the "independents," "the Libyan independents," or "the non-Persian Gulf producers."

This action centers about efforts of the majors and independents to resist the demands of oil-producing nations in the Middle East. In January 1971, Hunt, the other independents and the major oil companies entered into an agreement, the Libyan Pro-

---

1. The concession operated under the name of Nelson Bunker Hunt. In this opinion, "Hunt" will be used to denote the business entity; the full name of an individual will be used to denote the particular individual.

2. Also originally named as defendants were Occidental Petroleum Corporation, Grace Petroleum Corporation and Gelsenberg A.G. Prior to trial the action was discontinued as to Grace and Gelsenberg. Plaintiffs did not oppose Oc-

ducers' Agreement ("LPA"),[3] designed to present a united industry front to withstand increasingly aggressive actions by the Libyan government. In brief, under one provision of the LPA, the parties agreed to share the burden of production cutbacks imposed by the Libyans by providing the cutback party with replacement crude oil at producers' tax-paid cost.

Plaintiffs claim that defendants imposed an illegal customer and territorial restriction on resale of crude oil transferred to them under the LPA and that this restriction deprived them of access to the competitive market and forced them to sell the crude at distress prices. They assert an additional claim that the defendants conspired to withhold many millions of barrels of crude oil to which plaintiffs were entitled under the agreement. Both the alleged restriction and the alleged boycott are challenged as violations of section 1 of the Sherman Antitrust Act[4] and section 73 of the Wilson Tariff Act.[5] Defendants deny the antitrust charges; they assert counterclaims for rescission of an extension of the

agreement and for restitution based upon allegations that plaintiffs committed fraud by concealment of material facts.

The case came to trial after extensive pretrial discovery, which included oral depositions of parties and witnesses taken here and in various foreign countries, answers to interrogatories, document production and answers to requests for admissions. The discovery process resulted in a pretrial record of thousands upon thousands of pages of testimony and documents. The trial itself took thirty-eight days, with a record of more than 7000 pages. At the trial, twenty-four witnesses testified. Since the trial was to the Court, some testimony and a number of exhibits which include obvious hearsay were nonetheless received in evidence in an effort to expedite the trial. The Court repeatedly observed that its determination would be based only upon relevant and material evidence.[6]

## BACKGROUND

To put matters in proper perspective, it is desirable to set forth events preceding, con-

cidental's motion for dismissal at the end of plaintiffs' case made pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

3. The LPA is reprinted as an appendix to this opinion.

4. 15 U.S.C. § 1:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

5. 15 U.S.C. § 8:

Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void-when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter.

The parties have not treated the Wilson Act claims as distinct from the Sherman Act

claims, nor will the Court. The Wilson Act substantially "parallels Section 1 of the Sherman .Act, which is the primary law against restraints of import or export trade or commerce with foreign nations." United States Department of Justice, Antitrust Division, Antitrust Guidelines for International Operations, reprinted in Trade Reg. Rep. (CCH), No. 226, at 2 n. 2 (Feb. 1, 1977).

6. United States v. 1,291.83 Acres of Land, 411 F.2d 1081, 1086 (6th Cir. 1969); United States v. 396 Corp., 264 F.2d 704, 709 (2d Cir.), cert. denied, 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959); Allen & Co. v. Occidental Petroleum Corp., 382 F.Supp. 1052, 1054–55 (S.D.N.Y. 1974), aff'd, 519 F.2d 788 (2d Cir. 1975); Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 40 F.R.D. 96, 101 (N.D. Ill. 1966); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2412 (1971). Instances of hearsay abound in the record: Trial Record (hereinafter "T.R.") at 151, 169, 1038, 1356, 1452, 1484–85, 2611 (triple hearsay), 2693, 3677, 4802, 4127–28, 4373, 5191. It is noted, however, that there were instances where proffered evidence of questionable admissibility was received without objection by any of the parties, no doubt due to a laudable purpose of presenting a comprehensive picture of all events.

temporaneous with and subsequent to the signing of the agreement that is at the center of the controversy. In 1957, Hunt acquired from the Libyan government an oil concession known as the Sarir field. Three years later, Hunt assigned an undivided one-half interest in the concession to the British Petroleum Exploration Company (Libya). The Sarir field came "on stream" in 1967 and by 1970 was producing approximately 400,000 barrels of crude oil per day, with reserves estimated at half a billion barrels. In 1970, all the majors, except Gulf, were engaged in oil production in Libya, either on their own or in joint ventures with one or more other companies.[7] The majors also had extensive oil-producing holdings in the Persian Gulf nations: Bahrain, Iran, Iraq, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates.[8]

### The Libyan Situation

On September 1, 1969, Colonel Moamer Qaddafi and his Revolutionary Command Council ("RCC") overthrew King Idris and seized control of the reins of state. The new regime soon confronted the oil companies operating in Libya with demands for substantial increases in the "posted price"—used by the host government to compute taxes and royalties—of crude oil. Early in 1970, after the companies failed to yield in the first round of negotiations, the Libyans adopted a strategy which they continued to use in exacting concessions from the oil companies: they would single out a vulnerable company, threaten or impose production cutbacks to force it to yield to a demand, and upon its capitulation use the compelled terms as the basis of its bargaining position with the other companies. Occidental was the first to fall prey to this tactic, acceding to increases in the posted price and the tax rate on September 4, 1970, after the government had imposed production·cutbacks. By October the Libyans had forced the other companies to yield.

The ever-escalating demands and hostile attitude of the RCC led the executives of the oil companies to consider means of effectively resisting further demands. Both the independents and the majors recognized the desirability of a united negotiating front and a mutual help program whereby production losses sustained by one company would be shared by all. One idea which surfaced during this period, in several contexts, was that a company would be in a stronger position to resist the new Libyan demands if the intended victim had an alternative source of crude oil in the event of a government-imposed restriction on production. The suggestion of mutual ʼaid, however, did not advance beyond the discussion stage at that time.

The surrender by the majors and independents to the Libyan demands in the fall of 1970 did not bring peace in their time. Hardly had the compelled increases been in effect when the Organization of Petroleum Exporting Countries ("OPEC") met in Caracas, Venezuela in December 1970 and decided to demand even further increases in "government take," including posted price and tax rates. The Conference passed, *inter alia*, Resolution XXI.120 which provided that joint negotiations between the Persian Gulf nations and the companies operating in those countries begin on January 12, 1971 in Teheran.

Libya quickly moved into action. On January 3, the Libyan government summoned local representatives of the oil companies and outlined plans for implementation of the Caracas Resolutions. The demands for increases in posted price and tax rates beyond those agreed to in September and October were backed by the then familiar tactic of threats of cutbacks, "shut-ins"

---

7. Mobil had a majority interest in a concession with Gelsenberg. Texaco and Socal each controlled a 50% interest in a Libyan oil-producing entity known as Amoseas. Shell had a 16.67% interest in a group known as Oasis, the other members of which were three independents—Continental, Marathon and Amerada Hess.

Exxon had interests in the Zeltan field and Esso Sirte concessions.

8. In 1972, the defendants produced almost 2 billion barrels of oil in Saudi Arabia; liftings exceeded 1.3 billion barrels in Iran and 1.7 billion for the remaining Persian Gulf countries.

(prohibitions on crude liftings) and nationalization. On January 9, the Libyan government singled out Hunt and Occidental, giving each until January 16, 1971 to accept its "non-negotiable terms."

The new policies of OPEC presented the prospect of dire consequences to the oil companies. Demands won by one oil-producing nation from a company could be the starting position for the other countries. Under this practice of "leapfrogging," the oil companies could thus be whipsawed into yielding to the seemingly endless demands of their host countries. The recent actions brought home in dramatic fashion to the majors and the independents the urgency of a united front if effective resistance were to be made. Discussions were started in several forums in response to the OPEC meeting in December and were accelerated by the Libyan demands in early January.

One group that gave consideration to the problem was the "McCloy Group," named for its chairman, John J. McCloy, and comprised of the chief executives of the seven major companies. The Group had been meeting semiannually since the early 1960's. Formed initially to discuss penetration of Soviet oil into European markets and later concerned with the actions of OPEC, the McCloy Group was a discussion group which kept the Departments of State and Justice informed of its proceedings. An agenda-drafting committee of the McCloy Group convened on December 15, 1970, three days after the close of the OPEC Conference, to prepare an agenda for a full meeting scheduled for the second week in January. The committee was aware of the recent OPEC meeting but not of any formal demands. Subsequently another agenda-drafting meeting was set for January 6, 1971.

In late December 1970, Shell began to consider and develop a proposal for a united negotiating front for the industry. A senior Shell executive discussed the proposal with G.H.M. Schuler, Manager of Hunt's London office. On January 6, Brian Carlisle, a Shell official, presented Shell's proposal in London to members of the Iranian Oil Consortium, which included the seven majors, a French national oil company and Iricon, a group of American independent companies including Continental. Also on January 6, the McCloy Group agenda-drafting committee reconvened in New York City in preparation for a meeting scheduled for January 11. The committee began consideration of responses to the now public OPEC Caracas Resolutions of mid-December and the Libyan demands of January 3, 1971.

In the meetings prior to January 11, two distinct, yet related, plans took shape: (1) an industry-wide negotiating front in response to the demands sparked by the OPEC Resolutions and (2) a sharing proposal designed to help companies in Libya resist further demands. Although the record is not precise as to when and by whom the sharing proposal was first drafted, it is clear that when the McCloy Group agenda-drafting session convened in New York it had before it a draft containing the substance of such a proposal. The initial idea of a sharing agreement, which had been adumbrated several months earlier by several independents and majors, was that oil companies would share the burdens of cutbacks imposed by the Libyans. This proposal was linked early in the January meetings with a requirement that a participant not reach agreements with the Libyan government without the consent of the other companies.

From the outset, the majors sought to include in the deliberations Shell's partners in the Libyan Oasis group (Marathon, Continental and Amerada Hess), Occidental, and Hunt. Schuler and Norman Rooney of Hunt's London office were advised in late December of Shell's plan for united action. Nelson Bunker Hunt was sounded out on January 6 and indicated he thought the sharing agreement proposal was reasonable; and William Greenwald, Executive Vice President of Esso Middle East, telephoned Hunt a day or so later, urging him to attend meetings scheduled for the next week. Similarly, on January 8, David Barran, Chairman of Shell's Committee of Managing Directors ("CMD"), reassured Armand

Hammer, Chairman of Occidental, that Shell would support a sharing agreement, as Hammer had requested in order to resist Libyan demands. Over the weekend of January 9 and 10, Shell representatives contacted Shell's Oasis group partners, and Schuler arrived in New York as a Hunt representative.

Beginning January 11 and continuing for the next four days, the majors, now joined by representatives of the independents and officials from the Departments of Justice and State, engaged in a series of nonstop and overlapping meetings. At times all the parties met together; at other times the majors and independents met separately.[9]

The first order of business was establishment of a united negotiating front *vis-à-vis* the OPEC nations. After extensive drafting and redrafting, which engaged the attention of all parties, their representatives and advisors, a Message to OPEC was finally agreed upon. The statement called upon OPEC to conduct an "all-embracing negotiation" with a team of representatives of the oil companies.

With agreement upon the joint message, the companies turned their attention to a sharing agreement and the specific problem of Libya. By this time Nelson Bunker Hunt and his chief attorney and advisor Ed Guinn were participating in the meetings. The parties worked under pressure to reach agreement prior to January 16, when Hunt and Occidental were scheduled to meet with the Libyan government to respond to the January 3 and 9 demands.

The sharing proposal underwent revision after revision as representatives of the various participating companies offered and amended drafts. Throughout the drafting and negotiating process the basic idea was constant: in order to solidify a united negotiating front, the parties were not to accept

terms concerning increases in "government take" without prior approval of the signatories, and the signatories were to share the burden of any cutback in production imposed by the Libyan government on a basis proportionate to their share of total Libyan production. Parties who, in the exercise of their "vital interests," made offers to or agreements with the Libyans without the assent of the other parties would forfeit the benefits but would be held to the obligations of the agreement. Companies would provide crude oil under the agreement at tax-paid cost.[10]

While the principle of a united front together with a sharing of the burdens in Libya was readily agreed to, its effectuation presented problems which were resolved only after extensive negotiation. Early drafts provided that signatories would supply cutback parties with *Libyan* oil. This provision was deemed unsatisfactory because of the possibility that the Libyan government would not permit companies to transfer Libyan crude oil to cutback or shut-in companies. Thus later drafts of the agreement proposed to permit parties to substitute other crudes if Libyan crude oil was not available for sharing by reason of Libyan government action.

In addition to this "substitute crude," the concept of "back-up crude" arose: Persian Gulf producers (the majors) agreed to supply Middle East crude to the independents to replace Libyan crude of which they were deprived either because of cutbacks or a sharing program. Back-up crude was intended to establish parity between the majors—who could draw on vast alternative sources of crude oil in the Persian Gulf—and the independents, who had no such resources.

Two additional provisions included in the agreement are at the heart of this litigation: (1) the "pre-existing customer clause"

---

**9.** The McCloy Group met on Monday, January 11, 1971. The discussion centered about the OPEC Resolutions and the Teheran negotiations scheduled for the next day as well as the Libyan threats and demands. As the minutes of that meeting reflect, the conferees thought it "essential that other producing companies, in-

cluding the so-called 'independents,' . . . . be invited to participate" in the proposed joint negotiations.

**10.** "Tax-paid cost" referred to the per-barrel operating cost including royalties, taxes and other payments to the producing country.

(discussed in detail under the First Claim) and (2) the "dimes clause" or "cash option," which gave a Persian Gulf producer the option of paying ten cents in lieu of each barrel of Persian Gulf back-up crude it was obligated to supply.[11]

The dimes clause was the product of the majors' uncertainty as to their ability to provide back-up crude oil for an extended period of time. Early drafts of the sharing agreement provided for a six-month or one-year term. At some point in the discussions on January 13 or 14, representatives of the independent oil companies requested that the agreement be lengthened to three years in order to secure greater assurance of protection against Libyan tactics and demands, a proposal that troubled some of the majors because of the extended time factor.[12]

As a result of this concern, it was proposed that the sharing agreement include an option under which the Persian Gulf producers could pay ten cents in lieu of each barrel of Persian Gulf crude owed. Initially, the concept of a cash option was not acceptable to the independents for several reasons. It was thought that ten cents might not equal the per-barrel profit margin. Furthermore, Marathon and Continental were interested in receiving oil—and not dimes—which they could run through their refining systems. The prospect of receiving dimes instead of oil also concerned Hunt and Occidental who were scheduled to meet with the Libyan colonels in two days and faced threats of immediate cutbacks. A final objection was raised by Occidental that the majors might invoke the dimes option in a discriminatory manner, giving oil to some of the independents and dimes to others.

Under time pressure and the stress of constant meetings—with the majors and the independents at times caucusing separately—the dimes clause took final shape. The majors agreed to state that it was their "present intention" to supply Persian Gulf back-up oil; and to satisfy Occidental, they included a provision that if a party elected the cash option, it must provide dimes proportionately to all independents to whom it was obligated to supply Persian Gulf crude.

Agreement was finally reached. On January 15, the LPA was signed by fifteen oil companies, including plaintiffs and defendants, in the State Department in Washington. The agreement provided that it would not take effect until advice had been received from the State Department that it supported the agreement and from the Justice Department that it had "no present intention of instituting any proceeding under the antitrust laws with respect to the making or performance of this agreement." Such advice was subsequently received. On January 16, the Message to OPEC was published and a copy was delivered to the Li-

11. The "dimes clause" was embodied in paragraph 4 of the LPA:

4. In respect of each barrel of Persian Gulf crude oil a party is obligated to supply but has not supplied under paragraph 2(e) or 3 [the sharing provisions]:
(a) Such party shall have the option to elect to pay 10 cents; provided if such option is elected it shall apply pro rata as to every party to whom such Persian Gulf Producing Party has such an obligation;
(b) Such party shall have the obligation to pay said 10 cents if it is prevented from delivering such barrels by an act of the Government having jurisdiction and in each case such payment shall constitute a full and complete discharge of such party's obligations under such paragraph. Without in any way modifying, limiting or conditioning its legal right to exercise the option set forth above in paragraph 4(a), and it being expressly understood that the exercise of such option shall give rise to no claim other than that for payment of the amounts due under paragraph 4(a), each of the Persian Gulf Producing Parties states that its present intention is to supply Persian Gulf crude oil in discharge of its obligations under paragraphs 2(e) and 3.

12. As Carlisle testified at trial:
[When the independents] came and said, "Look we want the three years," the majors paused and thought, "Well, three years is a long time in the oil business. A lot can happen. We don't know what will be our position in years two or three, and we just cannot really see that we can enter into a firm commitment for three years to put this Persian Gulf crude oil into the pooling agreement as the backup crude. We must have this option."
T.R. at 2945.

byans. On the same day, Schuler, who had left for Libya before the LPA was signed, advised Libyan officials that Hunt would not accept their demands and requested that joint negotiations with other Libyan producers be undertaken.

In sum, the sharing agreement was conceived of as a mutual self-help pact;[13] the parties agreed to act as a united front in dealing with the Libyan government, and any loss of crude oil production suffered by a company for resisting government demands would be shared by all. The LPA sought to end the Libyan strategy of singling out a vulnerable company, exacting concessions from it and forcing those new terms on other companies—terms which might become the predicate for further demands by Persian Gulf countries. Viewed optimistically, the agreement was a means to foster collective resistance to Libyan threats and demands. Viewed pessimistically, the agreement was a way to "share in the misery"[14] of operating an oil company in Libya.

### The LPA Administrative Machinery

Following the execution of the LPA, the signatories established a London Policy Group ("LPG") and a New York Group ("NYG"). Each signatory had representatives on both groups. The LPG's function was to coordinate implementation of the LPA and the Message to OPEC. The NYG was to serve as a communications link between the LPG and American oil companies and to provide technical services and information to the London organization. Also established was the Libyan Emergency Supply Subcommittee ("LESSCOM"), a subcommittee of the NYG. Its purpose was to develop procedures for supplying crude oil or cash in lieu thereof under the LPA in the event that the sharing provisions of the

agreement were triggered. LESSCOM included a representative from each signatory to the LPA, and each signatory received copies of the minutes of LESSCOM meetings.

In April 1971, the companies achieved some sense of stability when the Libyan government entered into separate five-year agreements with each company concerning crude oil production. That stability was short-lived. On September 22, 1971, the OPEC nations passed Resolutions XXV.139 and 140 concerning, respectively, "participation" (i. e., government acquisition of an equity interest in an oil concession) and "currency parity."[15] The Resolutions required OPEC members to undertake negotiations with the oil companies on these issues.

The signatories to the LPA met in October 1971 to consider the Resolutions. They determined that coordination of strategies and positions on these issues was a necessary part of a united front. Accordingly, they entered into a Memorandum of Confirmation that the LPA encompassed the subjects of participation and parity and a Memorandum of Intent, which declared the parties' intention to consider collectively responses to the new Resolutions.

### BP Is Nationalized and LESSCOM Is Activated

On December 7, 1971, the Libyans, in an act of political reprisal against the British,[16] enacted legislation nationalizing BP's undivided one-half interest in the Sarir field. The action triggered the sharing agreement for the first time and thrust the Libyans and Hunt, who retained its half-interest, into partnership in operation of the field.

On December 16, 1971, the parties to the LPA executed a Further Memorandum of

---

13. The LPA was not intended to guarantee the parties a particular profit. The preamble to the agreement recognized that the parties "might suffer serious financial consequences which would not be fully alleviated by the limited mutual self-help provisions of this agreement."

14. T.R. at 1831.

15. The parity resolution arose in response to the declining position of the American dollar upon which oil prices were based.

For a fuller discussion of "participation," see pp. 238–240 infra.

16. The action related to an alleged position taken by the British government in regard to a controversy between the government of Iran and several Persian Gulf sheikdoms. T.R. at 248, 424–25, 559.

Confirmation, confirming that total or partial nationalization of a concession by Libya, including the nationalization of BP, and any demand or action related to such nationalization were within the purview of the LPA. Thus BP became entitled to Libyan crude oil from the other signatories, and the independents who transferred Libyan crude to BP became entitled to Persian Gulf back-up crude from the majors.[17]

LESSCOM was activated and by January 1972 had established procedures for implementing the sharing provisions of the LPA. It devised form cables to be used by parties for nominating[18] crude oil, for confirming nominations and for sailing arrangements; LESSCOM was to receive a copy of each cable. LESSCOM also requested periodic information upon which it could calculate entitlements and obligations to Libyan and Persian Gulf crude under the LPA.[19] Such information was provided to LESSCOM at least once a quarter and included actual figures for the prior quarter and expected production for the next quarter.[20].

Hunt, pursuant to the LPA, supplied Libyan crude to BP and began accruing entitlements to Persian Gulf back-up crude early in 1972. Hunt submitted its first nomination for back-up crude on July 11, 1972.

### Hunt Is Cut Back

Hunt's partnership with Libya thrust upon it by the nationalization of BP led to immediate tensions between Hunt and the Libyan operating company, Arabian Gulf Exporting Company ("AGECO"). AGECO demanded that Hunt supply personnel to help operate the Sarir field and that Hunt help market the Libyan share of the oil. These demands were backed up by the usual threats of nationalization or shut-in. Hunt supplied the personnel but refused to market what had been BP's share of the Sarir crude.[21] Hunt's refusal became a constant source of friction between it and the Libyans. In an effort to enlist Hunt's aid, the Libyans adopted a carrot-and-stick approach, offering "sweeteners"—such as increases in production levels—if Hunt would market the oil, and threatening nationalization or shut-in if it would not.

Hunt's persistent refusals to market the BP oil led the Libyans to expel Hunt personnel from the Sarir field in early 1972. In April and May, the Libyan government substantially cut back Hunt liftings. The cutback entitled Hunt for the first time to receive Libyan oil under the sharing agreement.

### The Deteriorating Oil Supply Situation

The Libyan situation and the operation of the LPA were only a part of the total picture of oil politics and economics in the Middle East in 1972. The majors were also met with demands and restrictions from the Persian Gulf countries. These actions were

17. Since BP was a Persian Gulf producer, it was placed in the position of receiving Libyan crude from other Libyan producers while supplying Persian Gulf crude to independents who supplied Libyan crude.

18. Parties "nominated" crude by designating a vessel that would be available to take a particular amount of crude oil at a designated port.

19. This included: a party's expected and actual production in each quarter; the maximum amount of oil the party could have produced absent Libyan government restrictions; the production of the Persian Gulf producers for each quarter; and, as to each non-Persian Gulf producer, the volume of pre-existing European and Western Hemisphere customer commitments or renewals thereof.

20. LESSCOM did not receive data concerning the tax-paid cost of a barrel of oil (the price paid for each barrel transferred under the LPA). Payments and disbursements under the LPA were handled by Price Waterhouse & Co., which did not disclose to the parties the tax-paid cost charged by the suppliers of crude oil.

21. Hunt's refusal was grounded on a combination of factors: (1) concern that BP would attach ships carrying Sarir crude upon arrival at ports of destination; (2) concern that marketing BP's share of the oil would violate the LPA; and (3) belief that such marketing was ethically wrong since it cast Hunt as an abettor in the nationalization of BP, an act Hunt considered illegal.

relevant to the Libyan situation because they affected the availability of Persian Gulf crude oil which served as back-up crude under the LPA. In 1972, actions by Persian Gulf nations created unanticipated and unprecedented supply shortages.

In April 1972, Kuwait suddenly imposed production restrictions on the Kuwait Oil Company, owned equally by Gulf and BP. The restrictions had a severe impact on Gulf, which found itself crude-short[22] for the first time in its history. Gulf traditionally had been a major supplier of crude on the world market; after the restriction, Gulf was forced to enter the market to purchase crude oil to meet its system and third-party requirements.

A second shock to the international oil world occurred in June 1972 when the Iraqi government nationalized the Iraq Petroleum Company ("IPC")[23] which produced the Eastern Mediterranean oil fields in Iraq. That action had a substantial impact on the supply situations of Shell and Mobil, both of whom had historically been crude-short. Shell's supply system further suffered from the Kuwait restrictions on Gulf because Shell had a long-term purchase contract with Gulf for Kuwait crude. By August 1972, Shell was in an acute deficit supply position, and the deteriorating supply situation led Mobil to cut back sales to third parties. Given these circumstances, the supply requirements of the LPA became increasingly burdensome. This situation highlighted a number of problems that had surfaced in the administration of the sharing agreement.

### Problems Under the LPA

The drafting of the LPA in a crisis situation produced a document that was clear in purpose but difficult in implementation.

Accompanying increased obligations to provide Persian Gulf back-up crude in a time of restricted supply were a plethora of operational problems that led to disagreements over the implementation of the sharing agreement.

### Statute of Limitations

An early problem arose when the independents were slow in lifting Persian Gulf crude made available by the majors, thereby creating substantial backlogs of accumulated entitlements.[24] In the summer of 1972, in an effort to resolve the problem, a proposal was advanced for a "statute of limitations," which in substance provided for (1) forfeiture of crude oil entitlements not lifted within a certain number of months and (2) a spreading out of the accumulated entitlements over eighteen months. All parties except Hunt were agreeable to the forfeiture provision. Since unanimity was required for such decisions, the proposal was not put into effect.

### Barrel-for-Barrel

The LPA's method of calculating crude entitlements created another source of contention, termed the "barrel-for-barrel" problem.[25] Under paragraph 3 of the LPA, an independent's Persian Gulf crude entitlements were calculated based on its Libyan production level in the month preceding the first cutback that triggered the LPA. Thus the base period was November 1971, the month prior to BP's nationalization. Essentially, an independent was entitled to Persian Gulf back-up crude to the extent its Libyan crude availability after cutbacks and sharing was less than its Libyan crude

---

22. "Crude-short" describes the position of an oil company whose equity entitlements to oil under its concessions (including its ability to lift more than its share) are insufficient to meet its total system demands and obligations to third parties.

23. Four of the majors owned interests in IPC: Mobil, 11.875%; BP, 23.76%; Shell, 23.75%; and Exxon, 11.875%.

24. The backlogs were due to logistical problems in scheduling liftings, securing customers, and arranging transfers with BP.

25. This "barrel-for-barrel" problem must be distinguished from the "barrel-for-barrel" policy adopted by BP in supplying Persian Gulf crude, discussed below at p. 233.

production in the base period.[26] Thus if a Libyan oil field's production level dropped after November 1971, due, for example, to a natural decline in productability, a party could accrue entitlements for Persian Gulf back-up crude in excess of the amount of Libyan oil it actually lost due to government cutbacks or sharing. Some majors believed that this went beyond the "sharing of losses" originally contemplated by the LPA. The "barrel-for-barrel" proposal attempted to limit Persian Gulf crude entitlements to the actual amount of net Libyan crude of which each non-Persian Gulf producer was deprived due to Libyan cutbacks or sharing under the agreement. In this instance, Continental, a major beneficiary of the LPA-mandated calculations, refused to agree to the proposal, and it too failed of implementation.

### Entitlement Issues

A question was also raised as to whether certain kinds of cutbacks qualified parties for crude oil under the agreement. Specifically, Gulf refused to recognize a "conservation" cutback imposed by the Libyans on Occidental in June 1972. Gulf maintained that only cutbacks resulting from government action taken in response to an oil company's refusal to accede to demands were covered under the LPA. Other problems centered about the pre-existing customer clause discussed in detail hereafter.

### New Libyan Demands

After promulgation in September 1971 of OPEC Resolution XXV.139 concerning "participation," the major oil companies were involved in negotiations with the Persian Gulf governments for approximately a year. During this period the Libyan government, aware of the negotiations, made no participation demands on any of the Libyan companies but adopted a policy of watchful waiting; there were indications that it would insist upon more favorable terms than those reached with the Persian Gulf nations. On September 30, 1972, as negotiations with Kuwait were about to be concluded, the Italian state oil company, AGIP, signed a participation agreement with the Libyan government which transferred a 50% interest in the concession to Libya. AGIP was compensated at the net book value[27] of its hardware (pipelines, pumps, buildings, equipment and improvements) used in production of the field and received no payment for the oil in the ground. It also accepted a "buy-back" provision which gave Libya the right to "put" oil to it that the Libyans could not market. These terms were significantly more favorable to Libya than the terms then being negotiated with the Persian Gulf nations, for the latter provided for immediate 20% participation rising to 51% participation over a number of years and compensation at "updated book value," an amount greater than net book value.

On October 4, four days after the signing of the AGIP agreement, the Libyan government demanded that Hunt accept a participation deal on AGIP-terms as well as pay Libya half of the proceeds from oil Hunt had exported since BP's nationalization. Hunt was given until October 18 to respond. The new demands confronted Hunt and the other signatories to the LPA with still another critical situation; they also served to highlight the unresolved problems, already discussed, that had developed during the course of implementing various provisions of the LPA. The ominous situation galvanized the parties into action.

The latest demands on Hunt were a major subject of discussion at a NYG meeting on October 6, 1972. A week later the Libyan Operators Group ("LOG") was established to coordinate and develop industry responses to the new Libyan participation demands. The LOG was comprised of representatives from all the companies operating in Libya and Gulf (which had no Libyan

---

**26.** This entitlement, as discussed in detail under the First Claim, was further subject to the amount of an independent's pre-existing customer commitments.

**27.** "Net book value" generally represented the depreciated value of the physical structures and equipment.

production). Also established was a Steering Committee of the LOG, with representatives from four majors (Shell, Mobil, Texaco and Exxon) and four independents (Continental, Marathon, Occidental and Hunt).[28] The mandate of the Steering Committee was to develop strategies and to direct actual negotiations with the Libyans. Laurie Folmar, a senior vice president at Texaco, was elected Chairman of both the LOG and the Steering Committee. With particular reference to Hunt's upcoming October 18 meeting with the Libyans, the Steering Committee developed specific guidelines based on the strategy that Hunt stall the negotiations until the Persian Gulf participation terms—assumedly more favorable than the AGIP-terms—were consummated and publicized.

On October 18, Hunt representatives, as previously directed, met with Libyan officials to discuss participation. The Libyans insisted on the three principles agreed to by AGIP: 50% participation, compensation at net book value, and a "put" right. They also persisted in their demand that Hunt market BP's former share of the Sarir field oil as well as pay to Libya half of the proceeds of Hunt's sales of Sarir crude since the BP nationalization. The Hunt representatives stalled, claiming that in order to ensure the competitiveness of Libyan oil they should wait until the Persian Gulf negotiations were completed.

Hunt officials met with the Libyans again on November 1, 2 and 4, at which the Libyans, to the surprise of Schuler, indicated a willingness to negotiate their demands. To make the three AGIP principles more palatable, they offered various "sweeteners," such as increased production in the field and relinquishment of the demands that Hunt yield half its sales proceeds and market BP's oil. Hunt was requested to return on November 23 to resume negotiations.

### Hunt's Efforts to Improve the LPA

Following these meetings, Hunt top personnel—the Hunts, Guinn, John Goodson (chief financial advisor), Schuler and Rooney—gathered in Dallas to discuss the Libyan situation. In deciding how to respond to the Libyan demands, they compared the AGIP-terms plus the "sweeteners" with their prospects under the sharing agreement. In weighing these alternatives, Hunt officials assessed the various operational problems that had arisen under the LPA. Hunt was particularly concerned that in the face of a tightening crude supply some of the majors, particularly Shell and Gulf, would invoke the cash option, paying ten cents in lieu of each barrel of Persian Gulf back-up crude they were obligated to supply. These and other considerations led to the so-called "Four Points"—minimum modifications Hunt would insist upon in the LPA before rejecting the Libyan participation demands. These were as follows:

1. . . . a restatement from the majors that it is their intention to provide PG [Persian Gulf] crude rather than 10¢/bbl.

2. . . . assurance that our customers will take our PG crude or that we can sell that PG crude to other than pre-existing customers.

3. . . . extension of the "safety net" [LPA] time period by 11 months during which no one collected under the "safety net" [i. e., the period from the signing of the LPA to BP's nationalization].

4. . . . if the other companies are able to negotiate a satisfactory deal, the other companies undertake not to sign the deal with the Libyans unless we are offered the opportunity to obtain similar terms.

Nelson Bunker Hunt and other Hunt officials urged Folmar to lobby with some of the majors in support of the Four Points. Thereafter the senior executives of the Persian Gulf producers met on November 10 to discuss the proposals and to consider recommendations to be made to their chief executives who were already scheduled to meet

28. The LOG machinery also included a Legal Subcommittee and a Technical Subcommittee.

on November 14 in Chicago. Also discussed at this meeting was the prospect of upsetting the Persian Gulf negotiations in the event Libya should obtain more favorable participation terms from Hunt. Differing positions were expressed on Hunt's proposals. Shell stated that it had decided to exercise the dimes option and would begin supplying cash instead of crude as of January 1, 1973. Folmar urged upon those in attendance support of an extension of the agreement in order to maintain a united negotiating front. After the meeting Folmar informed Nelson Bunker Hunt of the inconclusive discussion.

The November 14 meeting of the chief executives, originally called to discuss tactics to be adopted by the members of the Iranian Oil Consortium (then in negotiations with Iran), also considered at length Hunt's Four Points. The Persian Gulf producers, except Gulf, generally favored Hunt's request for a one-year extension, but could not agree on Hunt's three other points. Gulf agreed to go along with the extension on the following day.

The impending Libyan negotiations and Hunt's Four Points continued to occupy the LOG and the Steering Committee. At a November 16 meeting the Steering Committee developed Terms of Reference to guide the Hunt representatives in the upcoming November 23 Libyan session; these were adopted at a LOG meeting on November 17. The Terms of Reference were written limitations on the authority of negotiators to make proposals and were applicable to all companies negotiating with the Libyans. As drafted, they were compatible with the principles established in the Persian Gulf participation negotiations. Hunt agreed to abide by the Terms of Reference, subject to an extension of the LPA and to Hunt's "vital interests" rights under the LPA.

Also at the meetings of November 16 and 17, Folmar informed the independents of the fact and substance of the majors' meetings on November 10 and 14 and of their approval of the one-year extension. He further reported that no agreement had been reached with respect to the majors' intention to provide oil and not dimes or with respect to Hunt's other proposals. When Occidental and Continental indicated that they were not in favor of an extension of the sharing agreement and there was some dissension as to other Hunt Points, Folmar asked the independents to caucus in order to arrive at a common position which he could present to the Persian Gulf producers. After the caucus, the independents, except for Occidental, announced support for the one-year extension, subject to a satisfactory resolution of the dimes-versus-oil problem.[29]

A full LOG meeting for the chief executives was scheduled for the afternoon of November 20 to consider these matters. Before this meeting the Persian Gulf producers met separately to consider the independents' newly formulated position. Folmar brought the principals up to date on the November 16 and 17 meetings. He stressed the importance Hunt attached to a continued supply of oil and not dimes; some of the majors would not give assurances that they would provide oil in the future. Hunt was aware of this meeting.

At the full LOG meeting that afternoon, the majors and independents were represented by senior executive officers. Schuler requested that the majors state their intentions with respect to Hunt's First Point (that they supply oil and not dimes) for the remainder of the agreement. While the witnesses who testified on this subject are not in accord as to precisely what was said, the Court finds that in substance the following responses were given:

*BP*: Not sure what its position would be in 1973, but probably would be paying cash in 1974.

*Exxon*: Would supply oil if most of the other companies did so.

*Gulf*: Would provide dimes unless the Kuwait restriction were lifted.

---

**29.** Occidental later agreed by telephone to the independents' position, subject to certain reservations not pertinent here.

*Mobil*: Had not yet made up its mind whether it would supply oil or dimes.

*Shell*: Would honor its obligation and pay dimes in 1973.

*Socal*: Had been supplying oil and its intention was to continue to supply oil, but reserved its rights under the agreement.

*Texaco*: Intended to continue to supply oil as long as available, but recognized the right to provide dimes if it could not provide oil.

Following the poll, the majors, after announcing their willingness to extend the LPA for another year (Hunt's Third Point), requested the independents, now aware of the majors' intentions as expressed during the poll, to decide whether they would accept the extension. The independents caucused among themselves, the majors having left the room. During the caucus, Hunt sought to gain further assurances from the majors concerning the provision of oil instead of dimes. Rawleigh Warner, Chairman of Mobil, responded emphatically that Mobil had not yet made up its mind and could give no assurances. Hunt countered with a request for an increase in the dimes clause to twenty-five cents. When the majors, after a caucus of their own, agreed to increase the cash option to fifteen cents, the independents, except for Occidental, agreed to the extension. Occidental concurred the following day.[30]

On November 21, 1972, the parties executed a Supplement to the LPA, which included the agreed-to extension, an increase to fifteen cents in the option clause and changes relating to some of the operational problems. The LPA in other respects remained substantially the same. With the signing of the Supplement, Hunt was prepared to resist the Libyan demands in the upcoming negotiations.

### The Participation Negotiations

On November 23, 1972, Hunt representatives Guinn, Al Reed (Manager of Hunt's Libyan operations) and Rooney met with Petroleum Minister Mabrouk in Libya to discuss the government's demands for an AGIP-type participation arrangement. The Hunt personnel held firm to their rejection of the demands in the face of threats of nationalization; Mabrouk then indicated that the principles were negotiable and requested Hunt to make counterproposals. It was agreed that Hunt would return on December 6 with "a proposition."

When Guinn and Goodson returned on December 6, they discussed a proposal to sell Hunt's entire interest in the Sarir concession for 236,000 barrels of oil per day for two years, free of any cost of operation, royalties and taxes. The Libyans refused to consider the matter and ended the meeting abruptly. Since the proposal, referred to by defendants as the "secret offer," is the basis of defendants' counterclaims, other events related thereto are set forth in considering the counterclaims.

In mid-December 1972, the Libyans stopped all Hunt liftings of Sarir oil; liftings were restored in January 1973, but at an amount below Hunt's previous take. On December 30, 1972, Hunt filed a formal arbitration demand pursuant to a provision in the concession agreement. The arbitration was never conducted.

In January 1973, the Libyans turned their attention to the Oasis independents—Continental, Marathon and Amerada Hess. Four months of extensive negotiations, in which the Libyans insisted upon AGIP-type terms, yielded no result. On April 30, 1973, the Libyans adopted a new negotiating position. Major Jallud announced to the Oasis companies Five Points: (1) 100% participation, (2) compensation at net book value, (3) a buy-back obligation, (4) company investment in exploration, and (5) technical assistance. On the same day the Libyans again directed their attention to Hunt, requesting Hunt's appearance in Libya to negotiate the proposal presented by Goodson and Guinn on December 6. On May 7, Hunt declined the invitation, asserting that negotiations could prejudice the arbitration proceedings that Hunt had instituted.

---

**30.** Hunt's Second Point—the pre-existing customer clause—is discussed under plaintiffs' First Claim. *See* pp. 219–220 *infra.* Apparently the Fourth Point was not discussed.

### Nationalizations

On May 25, the Libyans ended all Hunt liftings. Hunt responded on May 30 by withholding tax and royalty payments. On June 10, the Libyans nationalized the Hunt interest in the Sarir field. In August 1973, Marathon, Continental and Amerada Hess signed participation agreements with the Libyan government. On August 11, 1973, Occidental was 51% nationalized; it immediately acquiesced in the action. On September 1, the Libyans issued a decree nationalizing 51% of the interests in concessions held by Exxon, Mobil, Shell, Socal, Texaco, ARCO, Grace and Gelsenberg.

### New Problems in the Sharing Agreement

These sudden changes in the positions of the oil companies significantly altered calculations of entitlements and obligations under the sharing agreement. Questions were raised as to whether the Oasis independents and Occidental had forfeited their entitlements by signing participation agreements with the Libyans. Mobil, Socal and Texaco asserted that they had. Libyan actions against the majors created further problems, apparently casting some of the majors in the role of entitlees to Libyan oil as well as obligors of Persian Gulf back-up oil under the sharing agreement. The situation was one of contention and counter-contention as to the obligations and rights of the parties. From the perspective of hindsight, it was indeed "confusion worse confounded."

In an effort to bring order out of chaos, a meeting of the NYG was convened on October 17, 1973, at which it was decided to instruct LESSCOM to calculate "Four Cases" [31] based upon alternative assumptions of entitlement and forfeiture of en-

titlement. The Four Cases were issued on November 20, 1973. It was understood that the cases were only a sample of the many possible permutations of entitlements and obligations. Because of the possibility that companies would want to adopt alternative variations, it was decided that LESSCOM would make available to each company all its raw data "so that each company can scramble its own eggs."

At the same time, supply problems worsened with the outbreak of the Yom Kippur War in October 1973. Libya and other OPEC nations imposed destination restrictions on oil companies and embargoes on oil deliveries to western nations, including the United States. Also in October, Iraqi nationalizations reduced Mobil's Persian Gulf crude supply by over 2 million barrels per month and also affected Shell's supply. Gulf liftings in Kuwait were cut in half in January 1974 and remained at the lower level throughout the year. The production cutbacks, embargoes and destination restrictions resulted in a curtailment of available world supply of oil and had a substantial impact upon the companies, forcing one to go on an allocation system in order to meet supply commitments and another to rely upon force majeure provisions in its contracts.

### The Collapse of the LPA

By 1974 the machinery of the LPA was in disarray. On January 9, 1974, McCloy, as counsel to all parties to the LPA, suggested that the industry's interests might best be served if conflicting claims could be resolved and the agreement liquidated by mutual consent. However, agreement was not reached and the liquidation did not occur.

---

31. *Case 1:* All signatories, including Occidental, Marathon, Continental, Hess, Grace and Gelsenberg, would retain their entitlements under the LPA.

*Case 2:* Same as Case 1, but Occidental, Marathon, Continental, Hess, Grace and Gelsenberg were to be treated as having lost their entitlements while retaining their obligations.

*Case 3:* Same as Case 1, but Occidental, Marathon, Continental, Hess, Grace and Gelsenberg's entitlements would be calculated on

the basis that the Libyan government's 51% participation interest in their concessions was a cutback entitling them to crude oil under the LPA, while their obligations would be calculated on the basis of production data reflecting only their retained 49% equity interest.

*Case 4:* Same as Case 2, but Occidental, Marathon, Hess, Continental, Grace and Gelsenberg's obligations would be calculated on the basis of production data reflecting only their retained 49% equity interest.

Libyan actions continued to plague the companies. Effective February 11, 1974, the Libyan government nationalized the remaining 49% of Socal's and Texaco's interests in Libyan concessions. And on March 30, 1974, Shell's remaining interest in the Oasis concession was nationalized.

According to LESSCOM figures released in 1974, Hunt was a major net entitlee to Persian Gulf and Libyan crude oil. Throughout the first half of 1974, Hunt attempted to obtain Persian Gulf crude from the defendants. Many of Hunt's nominations were rejected by the majors for reasons discussed hereafter under plaintiffs' Second Claim. After July 11, 1974, Hunt stopped nominating crude, although Mobil, Texaco and Exxon indicated that they were prepared to supply crude. In 1974 Hunt made four sales of Persian Gulf back-up crude to Veba-Chemie and Derby Oil Company, who plaintiffs concede were not pre-existing customers.

On April 29, 1974, Hunt filed suit in the District Court of the Eastern District of Virginia. Mobil was named as the defendant; Texaco, Socal, Shell, Gulf, Occidental, Continental, Hess, Grace, ARCO, Marathon, Murphy and Gelsenberg were named as co-conspirators. The complaint alleged breaches of contract and violation of the antitrust laws in the provision of oil under the LPA. Neither Exxon nor BP was named as a defendant or a co-conspirator. The plaintiffs entered a voluntary dismissal of that action. Thereafter, this action was filed on March 7, 1975. We now turn to plaintiffs' claims.

FIRST CLAIM:

THE PRE–EXISTING CUSTOMER CLAUSE [32]

■ The LPA contains the following provision, which the parties refer to as the "pre-existing customer clause":

32. As a preliminary matter, the defendants assert that the Court has no subject matter jurisdiction over the First Claim because the LPA falls outside the scope of the antitrust laws. They claim that the agreement was "an unprecedented political response blessed by both the State and Justice Departments and inspired by equally unprecedented threats to world oil supplies by the Libyan and other OPEC governments" and that the LPA was "designed to benefit energy consumers by combating production restrictions, price increases and the desire of the host governments to acquire control of the oil production facilities within their borders." Defendants' Post-Trial Memorandum at 5. Stressing the unique and noncommercial nature of the LPA, defendants seek to analogize the agreement to a strike insurance plan among railroads, which the Second Circuit has held to be beyond the reach of the Sherman Act. *Kennedy v. Long Island R. R. Co.,* 319 F.2d 366 (2d Cir. 1963).

The annals of antitrust law are replete with cases where the defendants have sought to justify their conduct on the ground that it promoted the common weal. *See, e. g., National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 693–95, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210–24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). But the Supreme Court has made clear that decisions to exempt allegedly anticompetitive conduct from the purview of the antitrust laws "must be made by Congress and not by private forces or by the courts. Private forces are too keenly aware of their

own interests in making such decisions and courts are ill-equipped and ill-situated for such decisionmaking. . . . [T]he judgment of the elected representatives of the people is required." *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 611–12, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972); *see Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 599, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 613, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). The defendants cannot withdraw their conduct from judicial scrutiny by reciting a litany of good intentions.

Nor is the *Kennedy* analogy a persuasive one. There, the Brotherhood of Railroad Trainmen charged that the strike insurance plan of the railroads—to the extent it helped a railroad resist wage demands—was "an attempt by the railroad industry to 'rig the price which it will pay for the essential ingredient of labor.' " *Kennedy v. Long Island R. R. Co.,* 211 F.Supp. 478, 489 (S.D.N.Y.1962), *aff'd,* 319 F.2d 366 (2d Cir. 1963). The District Court ruled that the plan was outside the purview of the antitrust laws, based on the exemption of section 6 of the Clayton Act, 15 U.S.C. § 17 ("The labor of a human being is not a commodity or article of commerce."), and the Supreme Court's holding in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The District Court also found that the plan placed no restriction on competition in the marketplace. 211 F.Supp. at 490. The Court of Appeals affirmed, stating that "[s]urely it cannot be said

3. During any sharing program . . . those of the parties with Persian Gulf production in excess of 150,000 barrels per day (the "Persian Gulf Producing Parties") shall further be obligated to supply Middle East crude at cost . . . to the parties other than the Persian Gulf Producing Parties ("Non-Persian Gulf Producing Parties") *to meet commitments to pre-existing European and Western Hemisphere customers or renewals thereof* in amounts equal to the difference between any party's Libyan production in the last full calendar month preceding the effective date of the first cutback after January 8, 1971 and its Libyan crude availability after all adjustments under [the sharing provisions]; provided that such total obligation of the Persian Gulf Producing Parties shall be subject to a maximum in 1971 of 1,500,000 barrels per day, in 1972 of 1,125,000 barrels per day, and in 1973 of 750,000 barrels per day, in each case less the number of barrels of crude oil supplied by the Persian Gulf Producing Parties to the Non-Persian Gulf Producing Parties in such year pursuant to [the sharing provisions]. (emphasis supplied)

Plaintiffs contend that the pre-existing customer clause on its face constitutes a *per se* violation of the antitrust laws. They claim it imposed upon them and the other independents, who allegedly were horizontal competitors of defendants, a restriction upon the identity and number of customers to whom they were permitted to resell Persian Gulf crude oil supplied under the LPA and also limited the geographical areas within which the crude could be sold.

■ Section 1 of the Sherman Act declares illegal "every contract, combination . . . or conspiracy, in restraint of trade."[33] It is well recognized that the statute cannot be read literally without condemning almost every commercial contract.[34] Thus, "[s]ince the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing standard of analysis."[35] Under this rule, the fact-finder probes into all the circumstances of a given situation to decide whether the alleged restrictive practice imposes an unreasonable restraint on competition.

■ However, over the years certain business practices have been found to be so manifestly harmful to competition and so lacking in any compensating benefits that they are conclusively presumed to be unreasonable. In the instance of such *per se* violations, prior experience obviates the need for an in-depth study of the impact of the challenged restriction on competition in the relevant industry.[36] *Per se* rules have been applied to prohibit horizontal pricefix-

---

that the instant form of railroad cooperation in combatting the risks of labor unrest effects an unnatural and anticompetitive regulation of the pricing, supply, or distribution of goods or services," and that any such effect the plan had on the price of labor fell outside the Sherman Act. 319 F.2d at 373.

Here, the defendants cannot avail themselves of the labor exemption. Moreover, the plaintiffs are not launching a broadside attack on the purpose and effect of the sharing agreement as a whole. They are challenging a particular clause in that agreement which, if found to be a resale restriction, has the potential of affecting the price and supply of crude oil. Thus plaintiffs' allegations concerning the pre-existing customer clause state a claim that falls within the purview of the Sherman Act.

**33.** 15 U.S.C. § 1. Plaintiff also asserts a claim under section 73 of the Wilson Tariff Act, 15

U.S.C. § 8. The provisions are quoted in full in notes 4 & 5 *supra.*

**34.** *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

**35.** *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *see National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Standard Oil Co. v. United States,* 221 U.S. 1, 59–62, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**36.** *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958);

**214**

ing,[37] vertical pricefixing,[38] horizontal divisions of markets,[39] tying arrangements,[40] and certain group boycotts.[41] Since the application of a *per se* rule dispenses with the traditional judicial inquiry into the purpose and effect of a challenged restraint, "[p]er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." [42]

▪ Plaintiffs, based upon their contention that the pre-existing customer clause constitutes a *per se* violation of the antitrust laws, further contend that they are relieved of the burden of proving the anticompetitive purpose or effect of the clause or that it was enforced. However, as the Court noted at the start of the trial, the

provision contains no explicit words or language of customer or geographic restriction. The challenged clause obligates the majors to supply Persian Gulf Oil to the independents "to meet commitments to preexisting European and Western Hemisphere customers or renewals thereof." Absent clear and unambiguous restrictions on resale—as were evident in *United States v. Topco Associates, Inc.,*[43] upon which plaintiffs so heavily rely—application of the rigid *per se* rule without further inquiry is not justified. The Court must undertake a searching analysis to determine whether the clause was, as plaintiffs claim, a horizontal restraint on the resale of Persian Gulf crude.

see *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

**37.** *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**38.** *Doctor Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

**39.** *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

**40.** *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

**41.** *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *But see Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir. 1978) (en banc), *cert. denied,* —— U.S. ——, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

**42.** *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–2558, 53 L.Ed.2d 568 (1977); *see id.* at 50 n.16, 97 S.Ct. at 2558:

*Per se* rules . . . require the Court to make broad generalizations about the social utility of particular commercial practices. The probability that anticompetitive consequences will result from a practice and the severity of those consequences must be balanced against its pro-competitive consequences. Cases that do not fit the generalization may arise, but a *per se* rule reflects

the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them. Once established, *per se* rules tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system of the more complex rule-of-reason trials, see *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 609–10, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972), but those advantages are not sufficient in themselves to justify the creation of *per se* rules. If it were otherwise, all of antitrust law would be reduced to *per se* rules, thus introducing an unintended and undesirable rigidity in the law.

**43.** 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

*Topco* involved a cooperative association of regional supermarket chains which procured and distributed to its members products under brand names owned by Topco. The participating supermarkets entered into agreements with Topco—which was found to be controlled by the members—designating the territories in which the member could market the Topco-brand products. The Supreme Court found that the licensing system worked in effect to insulate members from competition in Topco-brand goods and held the restrictions a *per se* violation of the Sherman Act. The Court rejected the defense that by restricting competition among members the association actually increased competition in the market as a whole. In *Topco,* the restraints were unambiguous—indeed they were admitted by the defendant to be a necessary part of a well-conceived plan to reduce competition among members to increase their competitive edge in the industry.

Consideration of the pre-existing customer clause must begin with the agreement in which it is imbedded. As related above, the LPA was an industry-wide attempt to resist the ever-escalating Libyan demands; it was part of a larger plan to present a united front for negotiations with all the OPEC nations. The agreement, which was negotiated and signed under the watchful eyes of representatives of the Justice and State Departments, was perceived to have important consequences for the economic and political well-being of the nations of Western Europe and the Western Hemisphere. The central purpose of the sharing agreement was to fortify vulnerable companies to withstand the Libyan threats and to help soften the blows visited upon a company for taking a resistant stand. The LPA was in effect a risk-sharing agreement—or, as the parties generally referred to it, a "safety net"—whereby the participating companies shared the consequences of Libyan action.

The provision of Persian Gulf back-up crude under the LPA was not an ordinary commercial arrangement. Under the agreement, the Persian Gulf producers were obligated to supply Persian Gulf crude to the plaintiffs and other independents at tax-paid cost—a cost below what defendants could have received for the oil on the open market. Nelson Bunker Hunt himself admitted that the LPA was not an ordinary commercial contract; indeed, he was unaware of any other arrangement similar to it in his thirty years' experience in the industry.

In short, the Libyan Producers' Agreement was a unique, *sui generis,* arrangement unparalleled in oil industry history. Plaintiffs correctly assert that the uniqueness of the LPA as a whole should not shield the defendants from antitrust liability as to any particular provision within the agreement. However, the pre-existing customer clause itself is novel in nature and was fashioned to further the basic purpose of the LPA. Plaintiffs would have this Court find the pre-existing customer clause a restriction on the resale of Persian Gulf crude. Such a conclusion is not warranted on the facts. The clause (1) is not, upon its face, a restriction; (2) was not intended as a resale restriction—indeed, its intent was procompetitive; and (3) was not implemented as a resale restriction.

### The Plain Meaning of the Clause

Plaintiffs contend that the pre-existing customer language on its face was a naked restraint on resale with no other purpose but to restrict to whom and where plaintiffs could sell back-up crude. Defendants assert that the clause served as one of the volumetric limitations on the amount of Persian Gulf back-up crude an independent was entitled to receive. Plaintiffs answered defendants' position by arguing that other parts of the paragraph determine the volume of crude to be supplied. As plaintiffs read the paragraph, an independent oil company's entitlements to Persian Gulf back-up crude were determined solely by the difference between its availability of Libyan crude oil after cutbacks and sharing and its production in a base period (November 1971); the paragraph further established, the argument runs, a maximum limit on Persian Gulf crude to be supplied by the majors to the independents. Accordingly, plaintiffs urge that the pre-existing customer clause was "patently redundant as a 'volumetric limitation.' "[44]

Plaintiffs' reading of the clause is strained and runs counter to the history and implementation of the clause. First, it is apparent that the words themselves are not a facial resale restriction.[45] Rather, the words "to meet commitments to pre-existing . . . customers" set forth the purpose for the supply of crude oil: *to enable*

---

**44.** Plaintiffs' Post-Trial Memorandum at 20.

**45.** Compare the explicit restrictions in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 38–39, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 601–02, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 595–96, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

the non-majors to fulfill such commitments.[46]

A fair reading of the words chosen by the parties is that the pre-existing customer clause established an *entitlement condition* for the supply of Persian Gulf back-up crude to the independents by the majors. The majors agreed to supply crude oil at cost if the independents had existing contracts and in amounts to enable them to meet such commitments. Thus an independent, if it had a pre-existing customer, was entitled to receive from the majors Persian Gulf crude measured by the difference between its Libyan production in the base period and its Libyan availability after cutbacks and sharing, not to exceed the volume of pre-existing customer commitments. In addition, there was an aggregate limitation on the total number of barrels per day the Persian Gulf producers as a group would be required to supply in each year.

That the pre-existing customer clause served as a volumetric limitation of entitlements to Persian Gulf back-up crude is abundantly established by the overwhelming weight of the evidence of key executives who participated in the negotiations of the agreement. It is further supported by the testimony of Norman Rooney (the Hunt official responsible for nominations and operations under the LPA),[47] and underscored by the subsequent practices of LESSCOM, the organization established by the parties to tabulate LPA entitlements and obligations. LESSCOM requested the independents to provide it with the volume of their pre-existing customer commitments. Rooney submitted to LESSCOM Hunt's volume of pre-existing commitments on a quarterly basis. If the pre-existing customer clause were purely a resale restraint, as plaintiffs assert, LESSCOM would have had no need of the data requested. On the contrary, the volume of customer commitments was viewed by those involved in the daily operations of the sharing agreement as a limit on Persian Gulf crude entitlements. Indeed, an April 1972 LESSCOM staff memorandum circulated to all LESSCOM members noted that: "It has always been recognized that the November 1971 basis represented a maximum volume, with actual entitlement 'limited to commitments to pre-existing European and Western Hemisphere customers or renewals thereof.'"[48]

### The Purpose of the Clause

That the challenged clause was a measure of entitlement is dramatically supported by the purpose of the clause. Early in the negotiating process[49] it was recognized that to satisfy the proposed Libyan crude oil sharing obligations, the parties would be compelled in some instances to force majeure other contractual commitments for the Libyan crude.[50] The majors had vast resources of crude in the Persian Gulf countries upon which they could draw to offset the loss of Libyan oil and which would enable them to satisfy their own needs or commitments under supply contracts with third parties. The independents were without such alternative sources. The supply of back-up crude at cost by the majors to the

---

**46.** This reading is consistent with an early draft of the pre-existing customer language, which provided that the majors supply Persian Gulf crude "provided such additional crude *is required to supply* such party's pre-existing customers for Libyan crude oil." Plaintiffs' Trial Exhibit 28 (emphasis supplied).

**47.** Rooney testified:

Q . . . [Y]ou mentioned that one of the limits on the amount of backup Persian Gulf crude oil you would get was the production which you had in the month prior to the first cutback, November '71 as it turned out. A That's correct.

Q . . . Was it another one of the limitations on the amount of backup Persian Gulf crude that you might become entitled to, the amount of commitments to pre-existing Western Hemisphere and European customers and renewals there[of]? A Yes.

T.R. at 6069.

**48.** Plaintiffs' Trial Exhibit 658–D, p. 2.

**49.** As noted above, *see* p. 200 *supra*, the idea of supplying crude to cutback companies first arose in the fall of 1970.

**50.** This, in fact, occurred: as Norman Rooney testified, Hunt force majeured its contracts with pre-existing customers when it began to supply Libyan crude to BP under the LPA.

independents was seen as a way to give the independents an alternative source, permitting them to meet pre-existing customer commitments. The back-up crude provision thus attempted to establish rough equality between the independents and the majors. The pre-existing customer clause, as a measure of back-up crude entitlement, was fashioned to enable the independents to fulfill existing contracts.

Hunt recognized this to be the purpose of the pre-existing customer clause. In a complaint in the earlier action filed in the District Court of the Eastern District of Virginia, Nelson Bunker Hunt alleged:

> [T]he parties intended that the[ ] non-Persian Gulf producers which suffered Libyan cutbacks should be allowed to meet their preexisting commitments with Western Hemisphere customers by receiving Libyan and Persian Gulf oil. This basic policy was to assure that a party cut back by the Libyan government would not be made to suffer on a proportion greater than any other party.[51]

And it is not without interest that when Hunt instituted the earlier Virginia action, having the very knowledge upon which the instant claim is based, no claim based on the pre-existing customer clause was then advanced.

Furthermore, there is no evidence that the clause was intended as a resale restriction. During the drafting of the LPA, no inquiry was made as to the identity of the independents' customers, the volume of oil that was committed by an independent to its customers, the location of the customers or the terms of any customer contracts.

Nor is there support for the contention that the purpose of the clause was to restrict the areas in which back-up crude could be sold. Originally the clause referred only to European customers. When Schuler, at the January negotiating meetings, mentioned that Hunt had a pre-existing customer in the Western Hemisphere, the clause was readily expanded to encompass it.[52]

Although plaintiffs repeatedly state that the provision was imposed upon them by the majors, this contention is without evidential support. The credible evidence establishes that the LPA, including the pre-existing customer clause, was agreed to after intensive arms-length bargaining by sophisticated and knowledgeable executives of worldly experience, including Nelson Bunker Hunt who during the negotiations had the advice of his longtime and experienced lawyer as well as other skillful advisors. So too, the other bargaining parties were flanked by a retinue of lawyers and advisors. At the negotiating meetings, no Hunt representative voiced any objection to the pre-existing customer language. With knowledgeable executives of the independents, guided by their lawyers, participating in the formulation of the clause, it is difficult to believe that all would have stood idly by and accepted the clause without protest if its intent and scope were anticompetitive and restrictive.

In sum, the restrictive intent and anticompetitive motive plaintiffs seek to read into the clause are without factual support. As candidly stated by Henry Schuler, a Hunt official actively involved in the January 1971 meetings: "The underlying rationale [of supplying back-up crude for pre-existing customer commitments] was . . . to enable the companies to remain in the international oil business."[53]

---

51. Complaint ¶ 44, *Hunt v. Mobil Oil Corp.*, Civ. No. 234–74–A (E.D.Va., filed Apr. 29, 1974).

52. One witness, George Parkhurst of Socal, who was active in the drafting of the LPA, explained the geographical language as follows:

> There was no desire for restriction. There was a desire to meet the pre-existing obligations of the need to supply one's customers. I must confess that the European thing was kind of a belt and suspenders possibility. It was pre-existing customers but it was thought that all the pre-existing customers were European. Later it was found there were Western Hemisphere customers and the language was expanded to include Western Hemisphere customers.

T.R. at 1224.

53. T.R. at 532–33.

### Implementation of the Clause

The subsequent actions of the parties in regard to the pre-existing customer clause negate plaintiffs' assertion that it was a restraint on the resale of Persian Gulf crude.

Primary is the fact that LESSCOM made no request for the identity or location of pre-existing customers. To establish their entitlement to Persian Gulf crude under LESSCOM procedures, the independents reported on a quarterly basis the volume of their pre-existing commitments up to their production level of November 1971; they did not report the name or location of the customers. LESSCOM did not investigate the accuracy of reported commitments or the destination of Persian Gulf back-up crude shipments, and its form cable did not provide for identification or location of a pre-existing customer. Nor did any Persian Gulf producer ever ask Hunt to document a pre-existing customer commitment or to demonstrate that a specific nomination for back-up crude was for delivery to a pre-existing customer.

Second, Hunt itself admittedly engaged in 1974 in four sales of Persian Gulf crude to two companies which were not pre-existing customers. No party to the agreement objected to these sales. Furthermore when, in 1972, reports were received that independents other than Hunt were selling back-up crude to oil brokers and other companies who were not pre-existing customers, the majors took no action to impose sanctions on them.[54]

Third, the counterarguments adduced by the plaintiffs are not convincing. Evidence cited in support of their charges is consistent with the view that the pre-existing customer clause was a condition of entitlement rather than a customer resale restriction.

Plaintiffs point to the so-called "Amerada Hess problem" as evidence of an alleged resale restriction. The problem arose when Amerada Hess' only pre-existing customer, Shell, declined in early 1972 to purchase Hess' LESSCOM Persian Gulf crude. Plaintiffs assert that the fact that some of the majors thereafter questioned the right of Hess to take back-up crude into its own refinery or to other markets demonstrates the restrictive nature of the clause. The Amerada Hess problem has been greatly exaggerated in terms of the issues of this case.

When Shell declined to purchase Amerada Hess' Persian Gulf back-up crude, Hess was under obligation to supply Libyan crude to cutback parties with no apparent prospect of receiving Persian Gulf crude in replacement. Hess believed that this result violated the intent of the agreement to put the independents in a position comparable to that of the majors. It therefore requested that it be permitted to take Persian Gulf crude into its St. Croix refinery. The reactions of the majors differed. Some companies stated that, in equity, Hess should be permitted to take the Persian Gulf crude to its refinery, even if this ran counter to the terms of the LPA. Other companies, concerned with the expansion of their obligations to supply back-up crude, took the position that an independent was not entitled to back-up crude in the absence of a pre-existing customer commitment. No matter what the positions of the companies, it is clear that the dispute concerned the definition of entitlement to back-up crude and not a question of to whom an independent could sell the crude it received. Moreover, the Hess problem was resolved to the satisfaction of Hess and with the agreement of all the signatories to the LPA. At the November 20, 1972 LOG meeting, the parties agreed to interpret "pre-existing customer" to include a company's own refining system. Thus Hess was free to take Persian Gulf back-up crude into its St. Croix refinery even though it had no pre-existing customer.

Plaintiffs nevertheless discern restrictive intent in comments by some of the majors

---

**54.** While it is true that some officials at Socal sought to ascertain the destination of several LESSCOM cargoes in Europe in 1972, this was an isolated event which was never acted upon and not a part of any attempt to enforce a territorial or customer restraint.

that Hess should be permitted to take the crude to St. Croix, but not to other markets such as Japan. But these comments arose during the course of discussions of how to resolve the problem and accommodate Hess where, as some of the majors believed, no legal entitlement to Persian Gulf crude existed. As such, they shed no light on the meaning or purpose of the pre-existing customer clause.

Plaintiffs also rely on several documents reflecting a proposal by Longmire of Exxon, Chairman of LESSCOM, that the majors "waive" the pre-existing customer language if the independents agree to the barrel-for-barrel principle (that is, that Persian Gulf crude entitlements equal the decrease in Libyan availability due to cutbacks and the sharing program). As Shell's minutes of a June 14, 1972 Persian Gulf producers' meeting state:

> The Chairman [Longmire] suggested that to make the [barrel-for-barrel] concept more palatable to members who would give oil (principally Marathon and Continental) it might be worthwhile considering a quid pro quo, whereby the P.G. producers gave up the pre-existing customer limitation (but kept the European and Western Hemisphere destination restriction) in exchange for acceptance for the concept.

However, the next sentence in the document makes clear that the "limitation" referred to is not a resale restriction, but rather a limitation on entitlement:

> The Chairman felt that continuing to insist on the pre-existing customer limitation *might·have the reverse effect to its*

*original intention*, and force Libyan producers to maintain customers at any price . . . .[55] (emphasis supplied)

In other words, Longmire was concerned that the desire to maintain an *entitlement* to back-up crude could lead the independents to compete with each other to maintain pre-existing customers.[56]

It might be argued with some plausibility, on the basis of the preceding evidence, that whatever the *purpose* of the pre-existing customer clause, it had the *effect* of restricting to whom an independent could sell its Persian Gulf back-up crude. Such an argument could be based on the contention that the independents, eager to avoid repetition of the Amerada Hess problem, felt themselves under constraint to sell only to pre-existing customers in order to preserve entitlements to Persian Gulf back-up crude. The theory however must yield to reality. In every instance that an issue was raised, the majors did not enforce a restraint; rather their actions sought to reflect the intent of the agreement: to enable the independents to remain in business and to establish parity between ·the majors and the independents.

Thus, although some majors contended that Amerada Hess lost its entitlement to Persian Gulf back-up crude because it had no pre-existing customer, the majors later agreed to interpret "pre-existing customer" to include a company's own refining system, thereby enabling Hess to receive back-up crude in a situation not contemplated by the agreement. So too, when Hunt first complained that the clause restricted with

---

**55.** Plaintiffs' Trial Exhibit 130.

**56.** Plaintiffs also rely on a Socal memorandum summarizing the June 14 Persian Gulf producers' meeting, which states:

> There was some discussion regarding offering a "quid-pro-quo" in the form of a waiver of the pre-existing customer commitment clause and make it a pre-existing *volume* commitment if non-PG Producers were reluctant to accept the "barrel-for-barrel" proposal. One possible advantage seen by some for this "quid" is that the smaller producers may be forced into a "price war" and undercut crude prices in order to maintain pre-existing

customers and retain their crude entitlement under the Sharing Agreement.

Plaintiffs' Trial Exhibit 127 (emphasis supplied). Plaintiffs argue that the suggestion that the clause be *changed* to a "volume commitment" demonstrates that it was not originally a volume limitation. But this misreads the document. The purpose of the proposal was to end the Hess problem; one solution would be to base entitlements to Persian Gulf crude solely upon the *volume* of pre-existing commitments and not upon the *existence* of a pre-existing customer commitment. The document clearly perceives the pre-existing customer clause as a condition of entitlement.

whom he could negotiate for the sale of his back-up crude, any alleged impediment was removed. At the November 20, 1972 LOG meeting, Nelson Bunker Hunt claimed that Exxon was "squeezing" Hunt on the price it was willing to pay for Hunt's Persian Gulf crude. George Piercy, Senior Vice President of Exxon, disputed Hunt, saying that Exxon was paying Hunt fair value and that if Hunt was not satisfied, it was free to sell the oil to anyone. It is true that Warner, Chairman of Mobil, objected to Piercy's "waiving" of the clause; but BP's representative at the meeting reported that it was "agreed" that Hunt was free to sell Persian Gulf crude to others if not satisfied with Exxon prices. And after the meeting Schuler was of the view, as expressed to Nelson Bunker Hunt, that Hunt had gotten relief from Exxon.[57] Again in 1974, Exxon, in response to a direct request from Hunt, assured Hunt it was free to sell Persian Gulf crude to whomever it chose. In light of the foregoing circumstances, Hunt's failure in his Virginia suit to make any such claim with respect to the pre-existing customer clause, as he now advances, takes on added force.

Plaintiffs' allegation that a territorial restriction was enforced is even more barren of evidentiary support than their customer restriction claim. In the more than 7000 pages of trial testimony, hundreds of exhibits and tens of thousands of pages of pre-trial discovery and depositions, plaintiffs can point this Court to but one passing reference to the Japanese market that plaintiffs contend the pre-existing customer clause was designed to protect. At the end of a set of handwritten notes made by a Mobil manager at a January 5, 1972 Persian Gulf producers' meeting, a notation read: "Independents oil—going West—how to keep PG [Persian Gulf] oil from going to Japan." The author testified that this was a note written to himself at the close of the meeting and not discussed at the meeting; he could recall neither the context of, nor the stimulus for, the notation. Plaintiffs offer no supporting evidence for their conclusion that the notation demonstrates the purpose of the challenged clause or its enforcement as a territorial restriction.[58]

On the contrary, there is evidence that the majors did not enforce a territorial restriction on the resale of Persian Gulf crude. In September 1973, Rooney cabled BP, with a copy to LESSCOM, that Hunt would lift 205,000 barrels of Kuwait crude with "destination Okinawa." Rooney could not recall that either BP or LESSCOM had questioned the destination of the shipment of Persian Gulf crude provided under the LPA. It is no answer, as plaintiffs urge, that the fact that Shell was the buyer of the crude rendered the destination of the crude of no importance. The fact is that Persian Gulf crude sold to Hunt at cost was resold in an allegedly forbidden territory and no action was taken with respect thereto.

To be sure, there were officials of some majors who were of the belief that the clause was restrictive.[59] In the main, they were supply executives who played no role in the negotiation of the agreement.[60] But as against this, there is the substantive evidence of practice to the contrary, as well as the testimony of those who hammered out the clause and knew first-hand of its intent.

Thus, the evidence of instances of actual practice, plus the fact that LESSCOM made no inquiry as to the identity or location of

---

57. Moreover, the next day, November 21, 1972, Exxon and Hunt entered into a six-month contract at a price with which Rooney was "fairly well satisfied." The contract was thereafter extended for an additional six months.

58. Plaintiffs also seek to find enforcement of a territorial restriction in comments made by some of the majors during the Amerada Hess discussions to the effect that Hess should be given oil to take into its St. Croix refinery but not be permitted to sell it elsewhere. However, as explained above, see p. 218 *supra*, these comments shed little light on the original purpose or alleged subsequent enforcement of the challenged clause.

59. *See, e. g.,* Plaintiffs' Trial Exhibits 101 & 103.

60. *See* note 79 *infra.*

the independents' customers and the further fact that the majors took no action when Hunt and other independents made sales to other than pre-existing customers, fully establishes that the pre-existing customer clause was not enforced as a resale restriction on customers or territories.[61]

### The Inappropriateness of a Per Se Standard

The plain meaning, purpose and implementation of the pre-existing customer clause abundantly demonstrate that it was not a restriction imposed upon the independents to limit their sales of Persian Gulf back-up crude to particular customers in particular areas. The clause, born of procompetitive intent, served as a condition of entitlement, embodying a method of quantification of the amount of back-up oil the independents were entitled to receive under the agreement.

Thus the *per se* rule applied to territorial divisions of markets and restraints on resale is inapplicable to this case. The Court is not confronted with the unambiguous and brazen attempt to divide markets and limit customers evidenced in *Topco*.[62] The pre-existing customer clause is novel and far removed from those types of agreements and business practices with which courts

have had the requisite experience to declare them to have a presumptively pernicious effect on competition.[63] The fact is that no court has ever been called upon to consider this particular clause or any resembling it— at least no such case has been called to this Court's attention by counsel nor has independent research by the Court unearthed any. The Court perforce must analyze the alleged provision under what has been the prevailing mode of analysis for three quarters of a century: the rule of reason.[64]

### The Rule of Reason

The classic formulation of the rule of reason, recently reaffirmed by the Supreme Court in *Continental T. V., Inc. v. GTE Sylvania, Inc.*,[65] was propounded by Justice Brandeis in *Chicago Board of Trade v. United States*:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or proba-

---

**61.** If the majors were concerned in any way about the pre-existing customer clause, it was that the independents might be receiving more crude than they were entitled to or than the spirit of the agreement called for (the barrel-for-barrel problem). Such a concern is understandable, given the fact that the back-up crude was provided at cost to the independents and sometimes at a substantial loss to the majors.

**62.** *See* note 43 *supra.*

**63.** *Cf. Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 447 (3d Cir. 1978) ("sham bidding" scheme "not . . . so anticompetitive that the court routinely should allow a party to invoke the per se rule and thereby avoid the need to show its affect [*sic*] on commerce in each case"); *Bradford v. New York Times Co.*, 501 F.2d 51, 60 (2d Cir. 1974) (rejecting *per se* standard in situation where there is "a total absence of federal Sherman Act experience").

**64.** An additional factor cuts against the plaintiffs' description of the pre-existing customer

clause as a resale restriction that warrants *per se* treatment. Under the LPA, the non-Persian Gulf producers were supplied crude oil at tax-paid cost; such provision of cost-crude to a company not owning an equity interest in the supplying concession is unknown outside of the LPA. Furthermore, there was no restriction on the plaintiffs' ability to buy Persian Gulf crude at prevailing market rates, and there was no restriction placed upon the resale of oil purchased on the market. Under such circumstances, a *per se* rule is inappropriate. *Carter–Wallace, Inc. v. United States*, 449 F.2d 1374, 1381–82, 196 Ct.Cl. 35 (1971); *see Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n. 14, 97 S.Ct. 2549, 2557, n. 14, 53 L.Ed.2d 568 (1977) (summarizing holding in *Carter–Wallace* as follows: "*per se* rule inapplicable when purchaser can avoid restraints by electing to buy product at higher price").

**65.** 433 U.S. 36, 49 n. 15, 97 S.Ct. 2549, 2557 n. 14, 53 L.Ed.2d 568 (1977).

ble. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.[66]

Even more recently, the Supreme Court has made clear the focus of the rule of reason: "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." [67]

Evidently, because of their strong reliance upon the *per se* rule,[68] plaintiffs have presented little or no evidence on the competitive nature of the industry as a whole, the nature and extent of the relevant market, competitive conditions, trade practices, peculiarities of the industry, or the impact on competition, if any, of the pre-existing customer clause. Plaintiffs simply press that the clause was imposed for anticompetitive purposes and thus it cannot be found to be reasonable.[69] They claim that the majors sought to limit the independents to existing customers in markets in the West to keep the new Persian Gulf crude availability from penetrating the "lucrative Japanese market."

The preceding determination under plaintiffs' *per se* claim renders extended discussion of this contention unnecessary. The plaintiffs' assertion is unsubstantiated and based on speculation and unwarranted inference. The record does not establish a purpose on the part of the majors to keep the independents out of eastern or any oth-er markets, either at the time of the drafting of the agreement or thereafter in its implementation. No evidence has been presented as to how "lucrative" the Japanese market was. The record is barren of any indication of the nature of the Japanese market, the involvement of the defendants in that market, the ability or desire of the independents to enter that market, or any economic factor with respect to it.[70]

The analysis of the clause as a condition and measure of entitlement to back-up crude is straightforward. Plaintiffs can make no assertion that the majors were obligated to supply them unlimited amounts of crude at cost. The limit chosen by the parties—after extensive negotiations in which the independents participated as equals—furthered the purpose of the LPA: parties were entitled to back-up crude to the extent crude was needed to fill existing customer commitments which could not be met due to the sharing program or Libyan action. The clause was likely to increase competition to the extent it increased the number of Persian Gulf sellers in the world market. The pre-existing customer clause only limited the amount of cost-crude that the independents could receive. There was no limit on the amount of Persian Gulf crude the parties could buy or sell on the market—save for the economics of supply and demand.

In sum, based upon a careful word-by-word reading and study of the entire trial record, the Court's contemporaneous trial notes, which include an appraisal of the credibility of the witnesses and their demeanor, the reasonable inferences to be drawn from undisputed or clearly estab-

---

**66.** 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *see National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 606–07, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**67.** *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

**68.** T.R. at 6855–56; Plaintiffs' Post-Trial Memorandum at 15.

**69.** Plaintiffs cite in support of their contention, *Times-Picayune Publ. Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), and this Court's opinion in *Walt Disney Prods. v. American Broadcasting-Paramount Theatres, Inc.,* 180 F.Supp. 113 (S.D.N.Y.1960).

**70.** *Cf. Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 541–42 (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

lished facts, and upon the totality of the testimonial and documentary evidence, the Court concludes that the pre-existing customer clause was a reasonable provision that tended to "promote competition" and did not "destroy competition."[71] The clause, as conceived, intended and implemented, was procompetitive rather than anticompetitive. It was not an unreasonable restraint of trade.

Plaintiffs' first antitrust claim is dismissed upon the merits, and judgment is directed in favor of the defendants.

## SECOND CLAIM:

## THE CONSPIRACY

Plaintiffs' Second Claim charges that the defendants unlawfully conspired to withhold from them substantial quantities of crude oil to which they were entitled under the terms of the LPA.[72] This concerted action allegedly prevented Hunt from fulfilling contracts with existing customers, whose patronage was lost, and deprived Hunt of access to new customers and markets.

Plaintiffs' conspiracy theory is amorphous, with each defendant playing a different role in the boycott. Under Hunt's theory, the defendants agreed to undersupply crude oil to Hunt—supplying only enough crude to keep Hunt in the united front against the Libyans. Thus some companies gave dimes instead of oil; others gave neither oil nor dimes; others supplied oil as required under the contract, but acquiesced in and furthered the alleged illicit activities of other companies. Each company, according to plaintiffs, agreed not to

dispute the positions taken by other companies.

Plaintiffs recognize that there is no direct evidence of any written or oral agreement among the defendants to sustain their charge. They rely upon the familiar doctrine that the existence of a conspiracy rarely can be established by direct proof but usually is inferred from acts, declarations and conduct of the alleged members of the unlawful combination.[73] Plaintiffs assert that they have sustained their burden of proof to establish the existence of the alleged conspiracy and each defendant's participation therein, based upon inferences drawn principally from (1) a series of meetings at which defendants discussed questions concerning the LPA's interpretation, operational problems and proposed amendments; (2) the exercise of the dimes option by Shell, Gulf and Mobil in late 1972 and 1973; (3) the failure by the other defendants to object to exercise of the cash option; and (4) the rejection by various defendants of Hunt nominations for Persian Gulf backup crude in 1973 and 1974.

The matters relied upon to sustain these wide-ranging claims, encompassing nearly three years of highly complex day-to-day operations of the world's largest oil companies, must be viewed, not in isolation, but in proper perspective as of the time of their occurrence, in relationship to one another, and against the totality of relevant evidence.[74]

### The Meetings of the Majors

Plaintiffs project their boycott charge against the background of the majors' rela-

---

**71.** Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); see National Soc'y of Professional Eng'rs v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

**72.** See United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**73.** Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct.

951, 58 L.Ed. 1490 (1914); see Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (per curiam); American Tobacco Co. v. United States, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Kahaner, 203 F.Supp. 78, 84 (S.D.N.Y.1962).

**74.** United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977); United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

tionship to one another over an extended period. They point to the regularity of meetings of the majors beginning in the early 1960's with the formation of the McCloy Group and continuing during the negotiations and drafting of the LPA and thereafter when the executives of the majors met to discuss various problems arising under the LPA. Plaintiffs assert that these meetings, at which they claim the majors fashioned agreed-upon positions, demonstrate a conspiratorial way of life on the part of the majors.

The fact is that many of the meetings occurred prior to the time plaintiffs fix as the genesis of the conspiracy. As contended by plaintiffs' counsel in closing argument and in post-trial submissions, the motivation for the alleged boycott derived from the magnitude of the majors' growing obligations to provide back-up crude to the independents, rejection by Hunt of the "statute of limitations" proposal, and the perceived stringent supply/demand balance arising out of events in the Persian Gulf nations.[75] These events occurred in the spring and summer of 1972, and the first nomination by Hunt for crude was made in July 1972. Thus meetings prior to this time do not support the charge asserted here.

Confined to its proper limits, plaintiffs' boycott conspiracy charge encompasses two phases. The first (designated by plaintiffs as the "mini-conspiracy") involved Shell, Gulf and Mobil, who allegedly agreed, in meetings in August and September 1972, upon a coordinated plan to avoid providing LESSCOM crude to plaintiffs with or without invoking the dimes clause. The coordinated plan was agreed upon, according to plaintiffs' theory, because the three companies, whatever they perceived their rights to be under the LPA, believed they were not free to act unilaterally in pursuit thereof and, moreover, feared the consequences of acting alone and being the first to invoke the dimes option. Thus as part of their conspiratorial purpose, they required the support of the other majors. The second phase of the conspiracy involved Texaco, Exxon, Socal and BP, who allegedly supported, or acquiesced in, the agreement of the mini-conspirators to exercise the dimes option and further agreed to provide sufficient Persian Gulf crude to prevent premature termination of the LPA. Plaintiffs claim that the conspiratorial agreement was carried out from late 1972 through 1974.

### The Charge Against Shell, Gulf and Mobil

As noted earlier, events in the Middle East had created severe crude shortages by the middle of 1972 for several of the majors, principally Shell, Gulf and Mobil. Shell's supply of crude had reached the point of "acute deficit" by August 1972 due to the Iraqi nationalization of IPC, the Kuwait restrictions on Gulf (a long-term supplier of crude to Shell), obligations under the LPA and other factors. As a result, Shell was buying crude on the open market while supplying Persian Gulf crude to independents at tax-paid cost under the LPA. Shell recognized the obvious—that one way to mitigate the crude-short position and reduce losses incurred by the provision of back-up crude was to exercise the LPA's cash option. It had no doubt of its right under the agreement to do so.

To Leonard Wheatley, a Shell International Petroleum Company ("SIPC") executive intimately involved with LPA matters, a decision to "go to dimes" seemed inevitable from an economic point of view, yet undesirable since it might damage Shell's reputation among other companies and disturb its relationship with its Oasis partners. As Wheatley testified at trial:

> . . . I was very apprehensive that whoever was the first Persian Gulf producer to announce his intention to exercise that election [of dimes] was going to be the recipient of a great deal of opprobrium and abuse, and it was not very greatly to my taste that Shell should move first and attract this if somebody else was likely to do so.[76]

---

**75.** T.R. at 6907; Plaintiffs' Post-Trial Proposed Findings of Fact ¶ 143.

**76.** T.R. at 2703.

Understandably interested in what another company was "likely to do," Wheatley, in late August 1972, asked James Varey, Vice President of a Shell group company in the United States, to undertake a "fishing trip"[77] to ascertain the likelihood that Gulf and Mobil—companies known to be in similar tight crude situations—would elect the option and, if so, the timing of such an announcement.

On August 24, 1972, Varey met with Herbert Goodman, President of Gulf Oil and Trading Company ("GOTCO").[78] Goodman, a chief supply executive, questioned the wisdom of Gulf's having committed itself to the sharing agreement, since Gulf had no production in Libya and consequently could only be a supplier of Persian Gulf back-up crude.[79] Gulf had become a signatory to the LPA in the interest of industry solidarity and in the belief that any Persian Gulf back-up crude it might be called upon to supply would, because of its "bottomless cup" in Kuwait, be virtually costless. Consequently, when Gulf was severely impacted by the Kuwait restrictions, the changed circumstances caused it to adopt a hard-nosed position with respect to its LPA obligations. It rejected all claims of entitlement other than those of BP and Hunt; as to recognized entitlements, it took the position that its obligation was limited to availability of Persian Gulf crude after it had met its other commitments. Gulf also was at that time "adamantly opposed" to paying dimes. Goodman acquainted Varey with Gulf's policies. Varey, in turn, told Goodman that Shell was considering going to dimes, imposing its own statute of limitations on unlifted entitlements, and insisting

upon documentation for questionable claims of entitlement. Goodman stated that he would welcome adoption of a statute of limitations but would not favor exercise of the dimes option.

The meeting made it evident, as Varey reported, that the positions of Gulf and Shell were "very different." Shell was a member of the Oasis group in Libya with three independents; Gulf had no Libyan production. Shell itself submitted a claim for Libyan oil, and it recognized entitlements of other Libyan producers under the LPA; Gulf refused to recognize any cutbacks other than BP and Hunt as coming within the sharing provisions of the LPA. And while Shell was preparing to move to dimes, Goodman indicated Gulf had no intention of doing so.

In his quest for information Varey next met on August 31 with H. J. Schmidt, Executive Vice President of Mobil. Schmidt expressed considerable concern about various problems plaguing the implementation of the LPA which affected the Persian Gulf crude obligations of the majors. Varey, for his part, noted his own company's apprehension about these problems and stated that Shell was considering going to dimes. Varey also reported on the discussion he had had the week before with Goodman of Gulf. Schmidt told Varey that Mobil's supply and distribution people had mentioned the possibility of exercising the dimes option but that its consideration was at an early stage. Mobil's position on this and other problems was undefined and awaiting consideration by W. P. Tavoulareas, Mobil's President and a chief architect of the sharing agreement, who was then away.

---

77. T.R. at 2704.

78. GOTCO is the logistical cog in the Gulf international machine. It arranges the movement of Gulf crude to Gulf refining and marketing companies and disposes of or purchases crude outside the Gulf system.

79. Goodman termed the LPA a "strange agreement." He testified that: "It was certainly not an ordinary contract in any way. It had not been negotiated by me or by any of my people. It had not been developed as a normal sales agreement in any way. It was political, what you might call a political kind of an agreement,

for completely different reasons than the economics of the corporation with which I was involved." T.R. at 3078.

It should be observed that supply executives of a number of majors questioned the policy judgment of top executives in the corporate hierarchy in supporting the supply of Persian Gulf back-up crude. Their critical attitude, which comes through in interoffice memoranda, explains a number of statements, not based on personal knowledge, which plaintiffs seize upon in an effort to support their claims.

A week after the Varey-Schmidt meeting, Mobil's supply department undertook a detailed analysis of Mobil's economic position as it related to the LPA. The study noted the problems that had developed under the tightened crude situation and reported that Mobil incurred substantial costs in purchasing crude at market prices while supplying crude at tax-paid cost to the independents under the LPA. Notwithstanding the losses incurred, the memorandum recommended that Mobil, in order to preserve the united front, oppose any move by the Persian Gulf producers to exercise the dimes option.

On September 14, Schmidt and Walter Bork (General Manager of Supply and Distribution Department) met with Tavoulareas. Tavoulareas was startled when informed of Mobil's rapidly deteriorating supply situation and of its supplying LESSCOM crude at a loss with a prospect of future losses. Tavoulareas, although informed of Varey's visit and that Shell was considering going to dimes in the fourth quarter of 1972, was unconcerned with Shell's position. The executives were concerned with three operational problems: (1) the growing backlog of unlifted crude entitlements, (2) the barrel-for-barrel problem, and (3) issues under the pre-existing customer clause. It was decided that Mobil would seek resolution of these problems which had adversely affected Mobil's obligation to supply Persian Gulf crude; election of the cash option was seen as a "fall-back" position to be resorted to if the implementation problems could not be resolved.

Schmidt called Varey on the same day of the September 14 meeting and informed him of Mobil's position. Varey thereafter cabled Wheatley in London and reported:

> [Mobil] intend to insist on a proper interpretation of the agreement, including the policing of the pre-existing customer requirement, and if they are unable to achieve this they will elect to pay 10 cents in lieu. They stressed that their first preference would be a proper policing arrangement and that the 10 cents provision would be a fall-back.[80]

At a September 20 meeting of Mobil personnel, it was agreed that the other majors would be contacted in order to gain support for the convening of a full NYG meeting to discuss the issues.[81]

The sum total of Varey's "fishing trip" was that he learned that neither Gulf nor Mobil was about to go to dimes. Shell's desire not to be first to declare dimes would not be realized.

### Shell Elects the Option

On September 26, 1972, Shell's Committee of Managing Directors ("CMD")—the company's chief management group—decided "that all steps should be taken to minimize the 100,000 b/d [barrels per day] crude supply obligation . . . in spite of the acknowledged delicacy of the situation." Wheatley and his immediate superior Brian Carlisle, Coordinator for the Middle East Region Organization of SIPC, learned the next day that this directive meant that Shell, based upon powerful arguments by its supply division, had decided to go to dimes. Both men, who were involved in the day-to-day operations of the sharing agreement and Shell's Middle East affairs in general, were resentful that the decision had been reached by the CMD without seeking their advice. Wheatley immediately transmitted a memorandum, under Carlisle's name, to Sir F. S. McFadzean, a Shell Managing Director. The document recognized the compelling economic arguments in support of moving to dimes, but urged that the announcement of the decision be postponed. The authors expressed their concern that the "potential political and intra-industry consequences of Shell's leading a movement to dimes" had not been properly canvassed. They were apprehensive lest Shell, a foreign corporation, be viewed by the American majors as "instrumental in

---

**80.** Plaintiffs' Trial Exhibit 150.

**81.** This meeting occurred on October 6, although consideration of the three problems was overtaken by discussion of the October 4 Libyan demands on Hunt.

the [safety net's] destruction." They were also concerned with maintaining "peace and calm" with Shell's Oasis group partners. Thus the memo suggested that:

> As an alternative to a public announcement of our intention to pay 10¢ henceforth—but in practice we believe only postponing this—we would propose to take a leaf out of Gulf's book, keep our own counsel, and routinely decline to accept further nominations under Lesscom on the grounds that our available oil is already committed up to this year's end.
>
> This means that disappointed nominators will have to approach other P.G. suppliers committed to the safety net and the consequences of our actions will be revealed via Lesscom staff and the grapevine and we shall be faced with enquiries, probably at my [Carlisle's] or your [McFadzean's] level, about our longer term intentions. We can procrastinate and obfuscate for some time and hopefully until Mobil or some other company brings the whole question out into the open; we can continue in the interim to prod Mobil towards this end.[82]

Plaintiffs press that the Carlisle-Wheatley memorandum demonstrates a concert of action among Shell, Gulf and Mobil. They point to the suggestion that Shell "take a leaf from Gulf's book," and the statements that "[w]e have had some success in inducing Mobil . . . to consider leading the movement [to dimes]" and "we can continue . . . to prod Mobil towards this end." Plaintiffs argue that while all three companies desired to evade their obligations to supply oil, none wanted to be the first to declare for dimes and provoke an adverse reaction from the independents; thus each searched for and received the "company" of the other two.

Plaintiffs' reliance upon the Carlisle-Wheatley memorandum is misplaced. The memorandum demonstrates on its face a lack of agreement and negates rather than

supports plaintiffs' claim. The memorandum states that Shell "can continue to prod Mobil *toward* [moving to dimes]," clearly indicating that Mobil had not yet reached a decision. It further notes that the authors "cannot make up our minds" as to the likely reaction of "the American majors" to Shell's decision. Moreover, Wheatley testified that the memorandum was written in resentment, under pressure, and with the intent of presenting arguments for the postponement of the announcement of a decision that was economically unassailable. He characterized his references to the prodding of Mobil as hyperbole. The Court, based upon the demeanor of the witness and the other relevant testimony, accepts Wheatley's testimony as well as his and Carlisle's sworn denials that they or Shell had prodded Mobil to exercise the dimes option.[83] Such overstatement is understandable given their strongly held view that postponement of the announcement was desirable and their anger over not having been consulted prior to the decision.

Furthermore, other evidence militates against the contention that the three parties agreed upon concerted action to withhold crude from plaintiffs by going to dimes or otherwise. On November 17, 1972, some seven weeks after plaintiffs contend that the alleged agreement among Gulf, Mobil and Shell was reached, Goodman wrote a memorandum to the Executive—the chief management group at Gulf—which proposed "[s]everal alternative courses of action," one of which was to "[o]ffer to pay ten cents per barrel to satisfy our Persian Gulf obligation." Similarly, a memorandum from Bork to Schmidt on November 22, 1972, states that since Mobil would begin to receive January 1973 LESSCOM nominations by December 10, 1972, "we need a decision on dimes versus oil for next year by the end of this month." These internal memoranda, written to senior executives, reflect a notable lack of coordination or prior joint decision.

---

82. Plaintiffs' Trial Exhibit 155.

83. The statement that they had had success in "inducing Mobil" was clearly inaccurate since

Mobil had decided to put the dimes option on the back burner on September 14. *See* pp. 225–226 *supra*.

### Shell, Gulf and Mobil Decisions on Dimes

The evidence abundantly establishes that the respective decisions by Mobil, Shell and Gulf to provide crude or to invoke the cash option were reached by each independently, upon the basis of sound business judgment in response to a tightening crude situation, and in the good faith belief that each had the right to exercise the option.

#### Shell

Shell supply data indicated a deteriorating supply situation throughout 1972 that rendered exercise of the dimes option wholly unsurprising.[84] Such a decision was reasonably predicated upon the economic fact that Shell was purchasing crude at market prices and supplying the independents with crude at tax-paid cost. Even Carlisle-Wheatley September 27, 1972 memorandum recognized that "[t]he fundamental conclusion that we should be better off paying 10¢ a barrel to the beneficiaries under the safety net and retaining the oil in our system [rather] than buying at TPC [tax-paid cost] plus 40/45¢ a barrel 'to replace it' is unarguable."

#### Mobil

Mobil was in a similar situation.[85] Its economic position compelled consideration of a move to dimes as reflected in Bork's November 22, 1972 memorandum to Schmidt:

> Invoking dimes instead of barrels under the Libyan Sharing Agreement for next year is a clear reduction in our shortfall position of at least 32 [thousand barrels

per day] and the difference between our estimated acquisition cost of oil and the 10¢ payment is $2.2 million for the year.[86] On November 27, Bork and Schmidt met with Tavoulareas and reported that Mobil would have to make spot market purchases at twenty-five to thirty cents above the tax-paid cost at which Mobil supplied the Libyan independents. Faced with projected losses of millions of dollars, the executives decided to go to dimes and announced the decision to LESSCOM on November 30. The decision to exercise the option was in the clear business interests of Mobil.

#### Gulf

The supply situation of Gulf also dictated a move to dimes. The Kuwait restrictions deprived Gulf of its "bottomless cup" of oil reserves and left it crude-short for the first time in its history. The obligation to provide Persian Gulf crude, believed by Gulf in January 1971 to involve no cost to it, thus became a substantial financial burden. When it became clear in January 1973 that the Kuwait restrictions would not be lifted and other sources of crude had been exhausted, Gulf invoked the dimes option. In the drastically changed circumstances that confronted Gulf, it is understandable that the option was brought into play. Gulf's decision concerning the provision of crude or dimes to the independents reflects business necessity and independent judgment based on its economic interests.

Where it is established—as here—that the decisions of the alleged conspirators in exercising a right under a contract were

---

84. In mid-June 1972, Shell projected an average deficit for the second half of the year of 325,000 barrels per day; in the next month Shell made arrangements to purchase an additional 27,000 barrels per day of Arabian Light crude and exercised an option with BP to lift 40,000 barrels per day of Kuwait crude for the fourth quarter of 1972. By mid-September, due to increases in demand and losses of availability in Nigeria and Qatar, the supply data indicated a deficit of 195,000 barrels per day for the second half of 1972. The same report stated that "[o]ther majors have no surplus crude oil to offer and in some cases are in a tight supply situation themselves." Defendants' Trial Exhibit 1842.

85. Mobil's supply situation was adversely affected by the IPC nationalization, reduction in overlifts (liftings above one's equity interest) in Saudi Arabia, and other factors. In the summer and fall of 1972, Mobil cut back sales to third parties "to alleviate a tight crude supply situation" and substantially increased spot purchases. Plaintiffs' Trial Exhibit 605. In November 1972, supply data indicated a projected 1973 crude balance deficit of approximately 100,000 barrels per day.

86. Defendants' Trial Exhibit 534.

based on sound economic judgments arrived at independently of one another, the coincidence of parallel action does not give rise to an inference of concerted action.[87] Viewed against the stringent and worsening supply situation and the prospect of mounting losses, had the executives of each company not acted as they did in exercising the dimes option, they would have left themselves open to charges of dereliction of duty or incompetence. To have exercised prudent judgment based upon an option right under a contract does not cast them in the role of conspirators engaged in an illicit scheme. Each major acted in the belief that it had an unrestricted right to exercise the option under the agreement—a belief that was well-founded.[88]

Appraisal of the testimony, the demeanor of the witnesses, and exhibits, with respect to events and meetings in August and September 1972 and related matters, requires a finding that plaintiffs have failed to sustain their charge that Shell, Gulf and Mobil engaged in a "mini-conspiracy" whereby they agreed to act in concert to reduce the supply of oil to Hunt or to invoke the dimes option.

### The Other Alleged Conspirators

Since plaintiffs have failed to sustain the first phase of the charge (the mini-conspiracy), it could be argued that there could be no attachment by others to a nonexistent conspiracy and inquiry should end at this point. However, plaintiffs press that under

---

87. *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1047 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Venzie Corp. v. United States Mineral Prods. Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975); *Modern Homes Institute, Inc. v. Hartford Accid. & Indem. Co.*, 513 F.2d 102, 110 (2d Cir. 1975); *DuPont Glore Forgan Inc. v. AT&T,* 437 F.Supp. 1104, 1124–26 (S.D.N.Y.1977), *aff'd on opinion below,* 578 F.2d 1367 (2d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978).

88. Plaintiffs argue that the majors were not free to exercise the dimes option at will; rather, they assert, a company could go to dimes only if Persian Gulf crude was unavailable because of governmental action or force majeure. This assertion is apparently intended to lend support to plaintiffs' claim that Shell, Mobil and Gulf felt they needed each others' "company," as well as the acquiescence of the other defendants, in invoking the dimes option, because according to plaintiffs' view, they were exercising it in a situation not anticipated by the agreement. Plaintiffs' interpretation disregards the clear language of the provision and is, in effect, a rewriting of the clause.

Paragraph 4(a) states that each Persian Gulf producer "shall have the *option* " (emphasis supplied) to supply ten cents in lieu of each barrel of Persian Gulf crude it is otherwise obligated to supply. There is no language of restriction or condition in the clause. Furthermore, paragraph 4(b) states that if a Persian Gulf producer is prevented from delivering barrels due to *government action,* then the party "shall have the *obligation* " (emphasis supplied) to pay ten cents per barrel. Since paragraph 4(b) contains an absolute obligation to pay dimes as provided therein, plaintiffs' inter-

pretation would render paragraph 4(a) surplusage.

Paragraph 4(b) also provides that "each of the Persian Gulf Producing Parties states that its *present intention* is to supply Persian Gulf crude oil in discharge of its obligations [under the sharing provisions]." (emphasis supplied) The use of "present intention" makes it clear that the majors had a choice as to whether they would supply crude or cash. Indeed, the language was included because the independents recognized that a clear option existed and wanted assurances that, if Hunt and Occidental were cut back for taking a resistant stand when they returned to Libya a few days after the signing of the LPA, they would receive oil and not dimes. Furthermore, the "present intention" language is preceded by the explicit statement that: "Without in any way modifying, limiting or conditioning its legal right to exercise the option set forth above in paragraph 4(a) . . . [the majors state their present intention to supply oil]."

To be sure, there was testimony by some of the executives and supply personnel of the defendants (most of whom were not present at the drafting of the LPA) that the intent of the provision was to permit the substitution of dimes for oil only when oil was not physically available. But the overwhelming weight of the testimonial evidence and the plain meaning of the words of the clause compel the conclusion that the Persian Gulf producers had an unrestricted option to supply dimes in lieu of Persian Gulf back-up crude. Plaintiffs' attempt to modify the clear language of the agreement by way of parol evidence must be viewed in light of paragraph 10 of the LPA which provides: "This agreement consists of the entire agreement of the parties; there are no oral promises, representations or warranties."

the second phase of the claimed conspiracy all the majors at a series of meetings in November 1972 agreed to act in concert to reduce the supply of Persian Gulf back-up crude to Hunt. In effect, plaintiffs argue that even if they have failed to sustain the mini-conspiracy charge, consideration of their overall charge is not foreclosed. Thus plaintiffs request a finding that

> during the course of and as a result of the series of secret meetings among Shell, Gulf and Mobil in August, September, and October of 1972; the communications with other majors arising out of those meetings; and the majors' caucuses on November 10, 14, and 20, 1972, the majors, by the end of the morning of November 20, had agreed on a concert of action to reduce their supplies of Persian Gulf Lesscom crude to the independents while keeping the independents "holding the line" in Libya.

They request the further finding that majors who did not go to dimes, whatever their own views as to the legitimacy of the contemplated actions of others, agreed to "support Mobil, Shell and Gulf in their withholding of crude, and . . . any other major which ultimately decided to limit its supplies of crude partially or wholly, or to go to 'dimes.' " [89] Plaintiffs contend that the boycott was executed when some majors went to dimes and when BP, Socal and Texaco allegedly undersupplied or ceased supplying Persian Gulf crude to Hunt in 1973 and 1974 with the support of the other majors. Needless to say, each of the defendants not only denies the charge of concerted action but contends that its respective acts reflected independently arrived at decisions in its own economic interest.

### The November Meetings

In the absence of direct evidence to sustain their charge that all the majors conspired to boycott Hunt, plaintiffs urge that an inference of such conspiratorial agreement is warranted from the circumstance that defendants engaged in what plaintiffs term secret and clandestine caucuses at which the dimes option as well as other LPA matters were discussed. To pass upon this contention it is necessary to recall the origin of the meetings.

As previously noted, following a meeting with the Libyans in October 1972, plaintiffs and their aides, in weighing the advantages of a "sweetened" AGIP-type participation deal against the benefits and burdens of the LPA, proposed the Four Points.[90] Hunt officials actively lobbied for approval of the Four Points and enlisted Folmar's aid to gain support for them.

The discussions at the November 10 and 14 meetings were a direct response to the Four Points and Hunt's request that Folmar sound out the majors' positions on the proposals. Since the defendants, in effect, were common obligors with respect to the back-up crude, it was natural for them to discuss among themselves Hunt's proposals and related problems, particularly since any change in the agreement required unanimous consent of all the LPA signatories. Indeed, it is difficult to understand how the majors could have considered Hunt's requests without these discussions. The majors were not required to convene a public meeting, nor were they required to invite the independents, who were, together with Hunt, bargaining vis-à-vis the majors for more desirable terms under the LPA. Nor can these meetings be properly described as secret. The record leaves no room to doubt that Hunt knew beforehand of the meetings and was advised afterwards by Folmar of what transpired at them.

Stripped of plaintiffs' unfounded charge of secrecy, these meetings reflect innocent conduct. They were meetings of parties to discuss common problems and consider responses to demands made upon them by Hunt. Just why the Court should ignore the plain basis for these meetings and find instead that they were a front for the development of a conspiracy to injure Hunt is

---

**89.** Plaintiffs' Post-Trial Proposed Findings of Fact ¶ 200.

**90.** *See* p. 208 *supra.*

not apparent. There is no evidence of anything that transpired at the meetings—either words, action or conduct—that permits a reasonable inference that any decision was reached or any discussion had concerning a boycott of Hunt. Given the stimulus for and the subject matter of these meetings, the mere fact that the parties met cannot support an inference of conspiracy.[91] It would be anomalous, indeed, to permit plaintiffs to bootstrap their claim of boycott by charging conspiracy when the majors met to consider Hunt's formally presented Four Points. Moreover, there is affirmative evidence that at these meetings there was support for supply of crude to Hunt. Folmar, Chairman of the Steering Committee and the LOG, urged Shell not to go to dimes when Shell announced its decision on November 10. He persisted in his opposition at subsequent meetings in an attempt to preserve the united front. Finally, based upon an evaluation of the credibility of witnesses and their demeanor, the Court accepts the sworn categorical denials of representatives and executives of the defendants who participated in those meetings that they had any agreement or understanding to boycott or withhold crude from Hunt or that at any other time they entered into any such arrangement.[92]

Even if, contrary to the Court's finding already noted, it were found that a mini-conspiracy existed, or that any conspiracy existed involving some but not all majors, the fact that the other majors attended meetings at which the subject of the conspiracy was discussed would not by itself establish intentional membership in the conspiracy. It is black letter law that to hold one as a participant in a conspiracy, he must by word, deed or conduct intentionally join the illicit enterprise; mere association with conspirators and presence at the scene of a conspiracy, even coupled with knowledge that wrongful conduct by others is being engaged in, are not by themselves sufficient to support the inference of knowing and intentional attachment to an illegal enterprise.[93] More is required; that "more" is woefully lacking in this case.

Plaintiffs, to sustain their charge, also urge that the defendants misled Hunt and the other independents at the afternoon meeting on November 20. The responses of the majors to Schuler's "poll" have been canvassed above,[94] and the Court finds that each company accurately stated its intention at that time.[95] Plaintiffs press

---

**91.** Cf. Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048–49 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

**92.** Plaintiffs also assert that at the November Persian Gulf producers' meetings the defendants agreed, as an act in furtherance of a conspiracy, to reject Hunt's points other than the extension. The record in fact demonstrates the antithesis of agreement. It is a semantical game, in which this Court will not indulge, to transmute nonacceptance of a proposal into an agreement not to agree.

**93.** See United States v. Steinberg, 525 F.2d 1126, 1333–34 (2d Cir. 1975), cert. denied, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); United States v. Johnson, 513 F.2d 819, 823–24 (2d Cir. 1975); United States v. Fantuzzi, 463 F.2d 683, 689–90 (2d Cir. 1972); United States v. Cianchetti, 315 F.2d 584, 587–88 (2d Cir. 1963); United States v. Stromberg, 268 F.2d 256, 267 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

**94.** See pp. 209–210 supra.

**95.** Plaintiffs place great weight on a BP November 30, 1972 telex which reported: "[Robin] Adam [a BP Managing Director] is writing a report on what he believes the majors will do and what the independents think they will do (not the same thing)." Plaintiffs' Trial Exhibit 185 (emphasis supplied). But a careful reading of the Adam memo, written four days later, makes clear that Adam was referring to the different interpretations the majors and the independents placed on the various positions taken during the poll. For example, Adam wrote that Socal

said that they would adhere to the terms of the contract and on being questioned more closely [Socal Chairman] Otto Miller said that it was their intention in entering into the agreement in 1971 to deliver oil. I regarded this as a pretty equivocal statement but it was certainly interpreted by the independents, and I checked this with the independents the following day, that Socal would definitely deliver oil through 1973/74.

Plaintiffs' Trial Exhibit 186 (emphasis in original).

that the conspiracy was effectuated in part at that meeting when no company contested the right of any major to go to dimes or opposed the position of other majors whatever its own view as to the legitimacy or illegitimacy of such positions. This contention—that silence permits the inference of knowing and intentional participation in the alleged conspiracy—upon the facts here presented borders on the frivolous. Hunt specifically requested the poll of the majors, a request which implicitly recognized that the majors had a valid alternative of supplying dimes in lieu of oil. Moreover, no Hunt representative made any objection to the stated position of any major, including Shell which announced its intention to go to dimes. To assert that a major should have protested Shell's position (or that of any other major) or else run the risk of attachment to the claimed conspiracy stands reason and logic on its head. "Silence" under all the circumstances does not permit a reasonable inference that any defendant acted in concert with one or more of the other alleged co-conspirators to deprive Hunt of crude oil.

### The Alleged Execution of the Conspiracy

■ Nor does the rejection of Hunt Persian Gulf nominations support plaintiffs' theory of a concerted plan to withhold or deprive Hunt of oil.

#### Exxon

At the outset it should be noted that Exxon continued to supply oil throughout 1973 and 1974, providing over 14 million barrels of Persian Gulf crude to Hunt. Plaintiff perforce concedes "that Exxon provided Persian Gulf crude throughout the life of the LPA (with the exception of one month in 1974)."[96] It has previously been noted that Exxon was neither named as a defendant nor charged as a co-conspirator in the Virginia action. Indeed, plaintiffs' own witness, Norman Rooney, the Hunt official responsible for crude nominations, was of the view that "Exxon was not a part of any conspiracy against Hunt."[97] In the light of plaintiffs' own concessions as to Exxon's adherence to the agreement, one is mystified that a conspiratorial charge was levelled against it.

#### Texaco

Texaco supplied plaintiffs with over 1 million barrels of Libyan crude until it was cut back by the Libyans in the summer of 1973. Texaco also supplied Hunt with 5 million barrels of Persian Gulf crude after the signing of the Supplement to the LPA in November 1972.

Four months after the nationalization of Hunt, Texaco reaffirmed its commitment to recognize Hunt's claims and to continue to supply crude rather than dimes; accordingly, it delivered almost half a million barrels of Persian Gulf crude to Hunt on November 20, 1973. At the very time that Texaco committed itself to recognizing Hunt's right to crude, it decided not to accept claims of other independents because of their alleged deviation from the terms of the LPA. In late October 1973, Texaco adopted a policy of accepting but holding "in abeyance" nominations it received for LESSCOM back-up crude. This policy, which it applied to all parties, was a result of the events surrounding the Yom Kippur War and the Arab embargo which placed Texaco in a tight crude situation and compelled it to force majeure commercial contracts and eliminate third-party sales.

In mid-1974, Texaco again began to provide crude oil. In May, June and July it accepted Hunt nominations for Persian Gulf crude although Hunt never lifted the oil. Thus Texaco supplied Persian Gulf back-up crude to Hunt at all times except during a period when it adopted a general policy of accepting and holding in abeyance nominations. Texaco's policy was a unique and unilateral response to its perceived supply situation. Whether its policy was justified under the agreement is not the issue; the question is whether the policy was

---

**96.** Plaintiffs' Response to Defendants' Post-Trial Proposed Findings of Fact at 54.

**97.** T.R. at 6440.

adopted to further the alleged conspiracy. The Court holds it was not.

## BP

BP was the first party entitled to receive Libyan crude from the other LPA parties. However, since BP was also a Persian Gulf producer, under the agreement BP was obligated to supply Persian Gulf back-up crude to the independents who were supplying BP with Libyan crude. From November 1972 until September 1973, BP supplied Hunt with 3.9 million barrels of Persian Gulf back-up crude; after October 1973 it rejected all Hunt nominations.

In late 1972, BP adopted a policy of supplying only so much Persian Gulf crude as it received Libyan crude. The net result of BP's policy was to restrict the amount of Persian Gulf crude it supplied to Hunt and other independents. While plaintiffs contend that BP's policy violated its contractual obligation under the LPA, in this instance too, that legal issue is not before the Court. What is presented is whether, as Hunt urges, this policy was part of and in furtherance of a concerted scheme to deprive Hunt of oil to which it was entitled. There is no evidence from which a factfinder can reasonably infer that BP's position, whether legally sound or not, was adopted to further a conspiracy to deny Hunt oil.

Plaintiffs charge that BP adopted its "barrel-for-barrel policy" with the knowledge that other majors, pursuant to the alleged conspiracy, would not object and with the encouragement of Exxon and Mobil, who supported the policy so that BP would have more Persian Gulf crude to supply to them. Yet there is not the slightest evidence that any of the majors played any part in the formation of BP's policy or that any ratified it during its execution. Moreover, while BP ceased accepting nominations for back-up crude after October 1973, it did accept nominations in August and September 1973 and made delivery in September and October—some three to four months after Hunt was nationalized. This alone would serve to undercut the plaintiffs' claim that Hunt was only supplied oil to keep it as a member of the united front. Once Hunt was nationalized, the motivation ascribed to defendants of keeping Hunt "in line" could no longer exist.

## Socal

Plaintiffs rely upon Socal's rejection of Hunt's Persian Gulf nominations in the latter part of 1973 and the first half of 1974 as establishing Socal's membership in and furtherance of the alleged conspiracy.

From July 1972 until Hunt's nationalization in June 1973, Socal accepted nominations pursuant to which it delivered 3.2 million barrels of Persian Gulf back-up crude to plaintiffs. One Hunt nomination was rejected during this period based upon Socal's position that it had fulfilled its obligation to the LESSCOM pool for that quarter. In July and August 1973, Socal accepted each Hunt nomination and supplied 1.6 million barrels of back-up crude; the last delivery occurred in mid-October 1973.

Following the agreements reached by Occidental, Marathon, Amerada Hess and Continental with the Libyans in August 1973, Socal contended that these companies had forfeited all their entitlements—both accrued and future—to Persian Gulf back-up crude. Based upon this view, Socal calculated that as of September 1, 1973, it had oversupplied the LESSCOM Persian Gulf pool from which Hunt and the other independents drew their entitlements by more than 3.5 million barrels. Accordingly, Socal rejected nominations from Hunt and Gelsenberg in September 1973, informing them that "[o]ur appraisal would indicate that our October obligations have been satisfied and therefore your nomination is not acceptable." Socal continued to reject all nominations for Libyan and Persian Gulf crude throughout the fourth quarter of 1973 and the first half of 1974. In June 1974, Socal invoked the dimes option, consistent with its announcement at the November 1972 poll that while it intended to supply oil, it reserved its rights under the agreement. A month later, Socal again began to provide crude and accepted nomina-

tions from ARCO for Persian Gulf back-up crude in September and October. Hunt at this point, upon advice of counsel, had stopped nominating Persian Gulf crude.

Plaintiffs contend that Socal wrongfully rejected nominations because under all LESSCOM calculations Socal was an obligor of Persian Gulf back-up crude and Hunt was a major entitlee. Socal responds that its calculated oversupply of back-up crude in September 1973 carried over into the fourth quarter of 1973 and was at least equal to the amount of its obligations as reflected in November 1973 LESSCOM calculations. Socal officials attributed rejections in 1974 to the general confusion over LESSCOM calculations, the Arab embargo and the prospect of a general liquidation of the LPA.

We need not pass upon whether Socal's position that it had oversupplied the pool is sound and so it was justified in rejecting nominations. Nor is the Court required to pass upon the accuracy of either Socal's or LESSCOM's calculations, or whether in fact Socal lived up to its obligations. The issue is whether its conduct in taking the position it did reflected its independent business judgment of its rights and obligations under the LPA or whether it was a contrived position as part of a conspiracy to deprive Hunt of crude oil. Upon the entire record, the Court finds no evidence linking Socal's policies to those of any of the other defendants; rather, its actions reflected its own independent judgment based upon its view of its obligations under the LPA.

It is true that Socal and BP rejected Hunt nominations for Persian Gulf crude in 1973 and 1974, but there is not a shred of evidence that the idiosyncratic policies of these majors were concerted variations on a boycott theme.

### Other Evidence Negating Plaintiffs' Conspiracy Charge

Not only have the plaintiffs failed to prove the alleged conspiracy, but the record contains a plethora of evidence that affirmatively supports each defendant's position that its actions were not concerted or anticompetitive in purpose.

The record is clear that no major singled Hunt out for special treatment under the LPA.[98] Majors who declared dimes, initiated allocation systems or rejected nominations did so without discriminating among parties. Indeed, Hunt was a major beneficiary under the sharing agreement.[99] Hunt was supplied over 30 million barrels of Persian Gulf crude by the seven defendants, of which over 20 million barrels were supplied after the allegedly conspiratorial November meetings.

Some of the crude Hunt claims to have been denied is allegedly owed by Shell, Mobil and Gulf, each of whom exercised the cash option. Hunt nominated dimes from these companies in May and August 1973 and received over one-half million dollars; however, Hunt stopped nominating dimes and renewed nominations of Persian Gulf oil in 1974, although it was repeatedly informed by Mobil and Shell that they had invoked the dimes option and were prepared to supply dimes but not oil. No other independent nominated Persian Gulf back-up crude from Shell or Mobil during the period they were providing dimes. Rather than demonstrating a conspiracy on the part of the defendants to deny Hunt oil, the record suggests that Hunt's policy of nominations for oil and dimes was carefully orchestrated as a prelude to a law suit.

Finally, the allegedly secret conspiratorial meetings display a marked disparity of positions among the alleged conspirators. On almost every issue—from the Amerada Hess dispute to the extension of the agree-

---

**98.** *Cf. Loom Crafters, Inc. v. New Central Jute Mills Co.,* 1971 Trade Cas. (CCH) ¶ 73,734, at 91,070 (S.D.N.Y. Oct. 26, 1971).

**99.** Plaintiffs' early claims that the defendants conspired to deny Hunt Libyan crude faded in light of the evidence at trial. Final LESSCOM

figures suggest that if any Libyan oil is owed Hunt, the vast majority of it is owed by other independents. The fact that the majors generally lived up to their obligations to supply Libyan crude undermines a claim of concerted action in regard to the Persian Gulf crude.

ment—different companies took different positions based on their independent interpretations of the sharing agreement and their own business judgments.[100] As the First Circuit has aptly put it: "We would be slow to accept the argument that if everyone acts alike it shows conspiracy, but if they act differently it merely means concealment."[101]

In sum, plaintiffs' conspiracy theory finds no support in the extensive trial record. Not only have the plaintiffs failed to carry their burden of proof, but the reasonable inferences to be drawn from the relevant testimonial and documentary evidence compel the Court to find that: (1) no agreement express or implied to withhold Persian Gulf crude from Hunt was reached during the November 1972 meetings of the Persian Gulf producers; (2) Hunt was not misled by the majors at the November 20, 1972 meeting as to their intentions to supply Persian Gulf back-up crude in 1973 and 1974; and (3) rejections of Hunt nominations for back-up crude were based on unilateral and unconcerted actions of the defendants.[102]

This has been a long trial with a long record, and perhaps this opinion has been overly long. Yet an objective overall view of the record compels the conclusion that whatever claims plaintiffs have, essentially they are for breaches of contract. This Court does not pass upon the validity of such claims nor of the defenses advanced to resist them. Those are matters to be decided in an arbitration proceeding which is provided for under the LPA.[103] The Court is firmly convinced that this record does not support the antitrust charges. Accordingly, the Second Claim is dismissed upon the merits.[104]

## DEFENDANTS' COUNTERCLAIMS:

### THE SECRET OFFER

The plaintiffs are not alone in their charges of secrecy, conspiracy and deception. Defendants assert that on December 6, 1972, Hunt made a "secret offer" to sell its entire concession to the Libyan government in consequence of which it forfeited entitlement to any crude oil under the terms of the LPA. Based upon the secret offer, defendants assert two counterclaims: (1) for restitution on the ground that by fraudulently concealing the secret offer after December 6, 1972, plaintiffs received substantial crude and cash in lieu of crude to which they were not entitled and (2) for rescission of the Supplement to the LPA on the ground that plaintiffs, by failing to disclose their intention to make the secret offer, fraudulently induced defendants to

---

**100.** *Cf. Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976) (reversing jury verdict for plaintiff on ground that disparate courses of action of alleged co-conspirators in pursuit of legitimate business concerns repelled finding of conspiracy, even though defendants had had telephonic communications and pursued common objective).

**101.** *Brown v. Western Mass. Theatres, Inc.,* 288 F.2d 302, 305 (1st Cir. 1961).

**102.** As courts have repeatedly recognized, the antitrust laws are not properly invoked every time a party to a contract claims injury because of another party's alleged nonperformance of the agreement. *See, e. g., Salerno v. American League of Professional Baseball Clubs,* 429 F.2d 1003, 1004 (2d Cir. 1970), *cert. denied,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971); *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 544 (E.D.Mich. 1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. de-*

*nied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975) ("The antitrust laws are simply not a high-powered version of the laws relating to breach of contract, to be used whenever one is possessed of a particularly passionate grievance growing out of a business relationship"); *cf. Hunt v. Crumboch,* 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945) (Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce").

**103.** Plaintiffs alleged a fourth claim for breach of contract as to which a proposed arbitration under the LPA was stayed pending the determination of this action. *Hunt v. Mobil Oil Corp.,* 410 F.Supp. 10, 27 (S.D.N.Y.1976), *aff'd,* 550 F.2d 68 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

**104.** Plaintiffs asserted an additional claim which the Court dismissed upon the "act of state" doctrine. *Id.* at 23–25.

enter into the extension on November 21, 1972. Accordingly, they seek the return of the value of all oil delivered and cash paid to Hunt after December 6, 1972.

### Counterclaim for Restitution

Crucial to the resolution of the first counterclaim are the LPA, its Supplement and related agreements. As we have seen, the LPA grew out of the perceived need for a united front to resist the Libyan government's whipsawing tactics which in the fall of 1970 had forced one company after another to capitulate to the Libyan demands. This basic concept was embodied in paragraph 1 of the LPA wherein each company declared its "intention not to make any agreement or offer of agreement with the Libyan Government with respect to *'government take'* as applied to crude oil without the assent of the other parties hereto." (emphasis supplied) The LPA did not prohibit a party from reaching a unilateral, unassented-to agreement with the Libyan government.[105] However, the parties deemed the concept of unified action in regard to Libyan demands of such importance that they provided in paragraph 5 of the agreement that a party making an unassented-to agreement or offer of agreement in regard to increases in "government take" would forfeit the benefits but be held to the obligations of the sharing agreement.[106]

The LPA spoke to the then recent OPEC Resolutions concerning "government take." With the passage in September 1971 of OPEC Resolutions XXV.139 and 140 concerning participation and parity, the parties by Memorandum of Confirmation dated October 18, agreed that those subjects were within the purview of the LPA. On the same date, the parties executed a Memorandum of Intent, affirming their desire to coordinate responses to participation demands by the OPEC nations. The November 1972 Supplement to the LPA stated that the Memorandum of Confirmation affirmed that "the participation issue is covered by the Libyan Producers' Agreement."

The clear import of these documents is, as the parties appear to agree, that any party who made an unassented-to agreement or *offer of agreement* with respect to *participation* lost its entitlements to crude oil under the LPA but retained its obligations thereunder. Plaintiffs do not dispute that on December 6, 1972, Guinn (Hunt's chief attorney) and Goodson (Hunt's chief financial advisor) had a discussion with the Libyan government in response to its earlier demands for participation, and that the substance of the discussion related to the sale of Hunt's entire interest in the Sarir field concession to the Libyans in return for 236,000 barrels of crude oil per day for two years, free of cost of operation, taxes and royalties.

Defendants assert that the substance of the December 6 discussion worked a forfeiture of Hunt's entitlements to LESSCOM crude. They proceed upon two separate theories to sustain their claim: (1) that the Hunt sale proposal was an unassented-to offer with respect to participation and (2) that it was a noncoordinated response to a demand for participation.

### Concealment of the "Secret Offer"

In support of their position, the defendants stress the secrecy in which Hunt cloaked its proposal. They contend that the only "logical explanation" for Hunt's "deliberate concealment" of the offer was the plaintiffs' recognition that the offer disentitled them to the benefits of the LPA.[107]

---

**105.** Paragraph 1 included the proviso that "nothing contained in this paragraph . . . shall obligate any company to take or refrain from taking any action if to do so would, in its opinion, be contrary to its vital interests."

**106.** Paragraph 5 provided:

If prior to December 31, 1973 a party makes an offer of an agreement or makes an agreement with the Libyan Government of the kind described in paragraph 1, without the assent of the other parties, it shall thereupon cease to be entitled to any of the benefits, but shall not be relieved of the obligations provided in [the sharing provisions].

**107.** Defendants' Post-Trial Memorandum at 155.

There can be no doubt that the Hunts, Guinn and Goodson engaged in conduct calculated to conceal from the parties to the LPA the proposal they presented at the December 6 meeting with the Libyans. On December 4, the Steering Committee met in London for the express purpose of developing strategies and positions for Hunt to present to the Libyans two days later. Although Goodson and Guinn were in London on December 4 en route to the scheduled conference of December 6 in Libya and were aware of the Steering Committee meeting, they deliberately avoided attending that meeting. Instead, Schuler and Rooney attended, in complete ignorance of what Goodson and Guinn planned to present to the Libyans on December 6. Schuler, at the last minute, was sent to Norway under a pretext by Nelson Bunker Hunt and diverted from accompanying Guinn and Goodson to Libya as he had planned. In Libya, the Hunt representatives continued their conspiracy of concealment. Following the meeting at which the proposal was presented, Guinn and Goodson reported orally to the Steering Committee and prepared a written summary of the meeting which was distributed by telex to LOG members. In both cases, consistent with their prior conduct, Guinn and Goodson deliberately omitted that the sale proposal had been presented to the Libyans.

In April 1973, when the Libyans requested that Hunt return for further negotiations along the lines of the Guinn-Goodson proposal, Nelson Bunker Hunt directed Schuler to draft a response declining the invitation. Schuler, still in the dark as to the substance of the proposal, asked Hunt what the proposal had been, yet Hunt refused to tell him. Concealment of the proposal from Hunt's own personnel, as well as the other LPA signatories, continued until the discovery process in this litigation uncovered it.

The defendants, on the basis of the clandestine and devious actions of plaintiffs and their most intimate advisors relative to the December 6 discussion, urge that a finding is warranted that Hunt believed that the sale proposal automatically effected a forfeiture of entitlements to LESSCOM crude. The Court finds that plaintiffs and their representatives intentionally concealed from the defendants that the proposal would be made and was made at the December 6 meeting and that such concealment was based on the belief that the sale proposal either triggered the LPA's forfeiture provision or that the majors would so contend. The Court rejects Nelson Bunker Hunt's testimony that the proposal was kept from the Steering Committee meeting in London on December 4 in order to prevent premature disclosure of it to the Libyans. This explanation hardly explains continued concealment after the proposal was made. The explanation is further attenuated in the light of Nelson Bunker Hunt's testimony that he was advised by Guinn, and believed, that the proposal did not come within the proscription of the LPA.

However, while the deceptive conduct of plaintiffs may be taken as probative of their personal belief as to the nature of their proposal, it is not conclusive that in fact a forfeiture was effected. The words and meaning of the documents that established Hunt's entitlements to LESSCOM crude and provided for forfeiture of entitlements control.

*Was Hunt's Sale Proposal an Unassented-To Offer with Respect to Participation?*

Defendants contend under their first theory that the "discussion" which occurred on December 6 was in fact an offer of agreement with respect to participation that was never assented to by the other parties and that the making of the offer automatically worked a forfeiture of entitlement to LESSCOM crude pursuant to paragraph 5 of the LPA. The Court has used the term "discussion" advisedly since Hunt contends that whatever Guinn and Goodson said on December 6 did not constitute an "offer of agreement," but was merely a tactic, a sounding out of Libyan attitudes; and even if what was said was an "offer," it was not an offer of agreement "with respect to participation."

### Nature of the Discussion

The nationalization of BP had thrust Hunt and AGECO (the Libyan operating company) into an uneasy partnership in exploitation of the Sarir field. Reference has already been made to the Libyans' numerous demands that Hunt market the BP oil, yield half of its revenue from crude sales, and accept AGIP-type participation terms. These demands were backed up by threats of shut-in or nationalization. Soon after the BP nationalization, during a series of meetings of plaintiffs and Hunt personnel in Dallas, it was suggested that one way out of the Libyan sea of troubles was an outright sale of the concession. Schuler, however, persuaded the plaintiffs that such an offer was an unwise tactic at that time. The idea was renewed in February 1972 when Nelson Bunker Hunt sent Guinn to Libya to present the sale proposal. Again Schuler intervened and persuaded Guinn not to make the proposal. However, the idea of sale of the concession remained in Nelson Bunker Hunt's mind during 1972.

Through October and November 1972, Hunt was under mounting pressure from the Libyans to accept an AGIP-type participation deal. On November 23, Hunt agreed to return on December 6, 1972 "with a proposition" regarding those demands. From October to shortly before December 6, plaintiffs and their advisors had almost daily sessions to discuss responses to the Libyan demands. At some point, it was decided that the sale proposal would be put to the Libyans on December 6.

Of those present on December 6, Goodson was the only person who testified as to what transpired.[108] He stated that Guinn had asked whether the Libyans would be interested in buying Hunt's one-half interest in the concession. Nelson Bunker Hunt and William Herbert Hunt testified that their specific instructions to Goodson and Guinn were to sound out the Libyans on a proposed sale; that these longtime trusted confidants were not authorized to submit any offer to the Libyans; that they were instructed not to discuss "participation"; and that, even if the Libyans displayed interest, they were not to make any commitment. The testimony of Goodson and the Hunts on this subject is unbelievable and strains credulity to the breaking point. Not only is the testimony sharply discredited by surrounding facts, circumstances and events, but it is effectively challenged by a letter written by Guinn in April 1973 to John Connally, whom Hunt had engaged as an arbitrator following the December 1972 shut-in. Guinn wrote:

> The only thing which came out of our December 6 meeting was *an offer* that if the Libyan Government would make available to Bunker, 236,000 barrels [of] oil per day, free of any cost of operation, royalties and income taxes for a period of two years, that we would be willing to relinquish our half interest. This was a very confidential *offer,* not to be made public to anyone, as even our own employees (including Schuler) do not know of this *offer.*[109]

The document, written by a man Nelson Bunker Hunt referred to as his "valued" and "trusted" counsel, termed the proposal an "offer" no less than six times.

There was nothing tentative about the proposal. Plaintiffs had been considering such a proposal for almost a year. It was presented by the chief attorney and the chief financial advisor of the Hunt organization. Sale of the concession for two years of free crude was a carefully constructed alternative to participation and a way to escape from the aggressive actions of the Libyan government. The Court finds that the statements made by Guinn and Goodson at the meeting with the Libyans on December 6, 1972 were authorized, intended and understood by plaintiffs as an offer to sell the entire Hunt interest in the Sarir field.

### Was the Offer an Offer of Agreement "with Respect to Participation"?

"Participation" is not defined in any of the agreements. The plaintiffs argue that

---

**108.** At the time of trial Guinn was deceased.

**109.** Defendants' Trial Exhibit 717 (emphasis supplied).

"participation," as contemplated by the parties, was an arrangement whereby a government obtained an equity interest in an oil company's concession and the company remained active in the operation of the concession, in partnership with the government, providing services such as operating the concession, marketing the government's share of the crude oil or assisting with exploration activities. The defendants contend that Hunt's offer necessarily encompassed an ongoing relationship during the two-year period when Hunt would be receiving daily 236,000 barrels of oil. This relationship, it is urged, in effect would require operational activity on Hunt's part in transporting and marketing the oil. Defendants further stress that title was not to pass to the Libyans until the expiration of the two-year period. From the welter of conflicting concepts and testimony no clear definition of the term emerges.

"Participation" was a significant shift from the earlier government demands for increases in "government take," for it represented not merely increased payment to the host government but also a surrender by the operating company of a share of the equity interest in the concession. Whatever conflicts there may be, one concept seems to emerge from the various definitions offered at trial: participation concerned a working relationship between the host government and a concessionaire whereby the government had an equity interest in the company's concession.[110]

A sale generally differs from participation in fundamental and material respects. The simplest case, where the company receives one lump-sum cash payment and "walks away" from the concession, would not constitute participation since the company's interest in the concession, whether fee or leasehold, is immediately eliminated. However, the Hunt sale offer was not a lump-sum cash sale; the proposal envisaged compensation in the form of two years of tax- and royalty-free crude oil, with Hunt conveying title at the end of the two-year period. Defendants urge that this two years of continued lifting constitutes the type of continuing relationship which identifies participation agreements.[111]

But the provision of crude to Hunt under the sale proposal was not intended as a form of joint operation of the concession; rather, it was a method of compensation for a sale of the entire interest. More importantly, under the proposal, Hunt would play no role in the operation of the Sarir field. To collect its payments, Hunt had only to have tankers take crude from the pipeline at Tobruk, some 200 miles from the Sarir field. Indeed, Hunt had played no role in the operation of the concession and had not controlled or monitored liftings since its engineers had been expelled from the field in early 1972, yet it had continued to lift oil for more than a year. Thus, the Hunt proposal lacks the crucial aspect of a continuing relationship, through joint operation or provision of services, characteristic of a participation arrangement. As stated by E. L. Shafer, a Continental official with exten-

---

**110.** The AGIP participation agreement—reached in October 1972—is typical. Under it, the company transferred 50% of its interest and was compensated at the net book value of the hardware on the concession; AGIP also agreed to purchase oil that the Libyans could not sell elsewhere.

The actual percentage of the interest transferred is not necessarily determinative of what type of arrangement constitutes a participation. For example, in Iran and Qatar "100% participation" agreements were negotiated in which the participating companies gave up all ownership interests but continued to provide services to the host government, such as operational assistance, investment or off-take of crude at preferential prices.

**111.** Thus, J. K. Jamieson, Chairman of the Board of Exxon, testified:

Q Would a proposal to sell [one's concession] for one or two years' oil production be a participation proposal?
A I think you are getting into an area here that . . . I find it difficult to define as participation. If you have any tie at all to a property, I consider that a degree of participation. If you just settle for cash and walk away, that is not participation. Well, that is maybe a black and white definition, but that is my definition.

T.R. at 4396–97.

sive experience in the participation negotiations,

A [P]articipation meant the government taking an equity position in the properties from 10 percent to 100 percent. They would take an equity position and there would be a continuing relationship by the particular company or companies with the government in some form, continuation of services.

Q Did there have to be that continuing relationship or continuation of services?

A As I was thinking of it at that time, and as I believe the government was using it at that time, at least in their conversations with me, yes. *And I gather you are drawing a distinction here between participation and a sale.*[112]

Nor does the fact that title was not to be conveyed until the expiration of two years establish a continuing relationship with respect to the operational aspects of the concession.[113]

 In sum, while the issue is close, the conflicting evidence is such that the defendants have not carried their burden of establishing, by the required degree of proof, that the Hunt offer to exchange its interest in the Sarir field for 236,000 barrels of crude oil a day for two years was an offer of agreement with respect to participation.

*Was the Offer a Noncoordinated Response to a Libyan Demand Which Disentitled Hunt to LESSCOM Crude?*

Under the second branch of their restitution counterclaim, defendants rely in large measure upon the Memorandum of Intent of October 18, 1972. They argue that the Memorandum committed the parties to the LPA to consider collectively any response to Libyan demands regarding participation and parity. The Memorandum provided:

[The oil companies] declare that they wish to consider collectively the responses to be made to the governments' demands and courses of action to be followed either individually or jointly during the conduct of negotiations· . . . .

In furtherance of the foregoing, the parties recommend that they either individually or collectively as appropriate make coordinated responses and take coordinated actions with reference to the governments' demands or actions associated with or related to [the participation and parity Resolutions].

Defendants further assert that the Memorandum affirmed a commitment which "inhered in the LPA itself" to coordinate responses to Libyan demands. Here, the defendants contend that it matters not whether the Guinn-Goodson discussion on December 6 in response to Libyan participation demands is described as a sounding out, an offer of agreement of participation or an outright sale which is not an offer of participation; the mere fact that the response to a participation demand was made without prior collective consideration and coordination disentitles Hunt to the benefits of the LPA. Defendants fortify their argument by emphasizing that following the participation demands upon Hunt in October and November 1972, the parties collectively agreed upon strategies and negotiating positions for Hunt as set forth in the Terms of Reference approved by the LOG in November 1972.[114]

The participation deal along the lines of the Guinn-Goodson proposal made December 6, 1972 *was not, in fact, a participation offer.* We have never made any offer to accept a participation deal to the Government.
Defendants' Trial Exhibit 717 (emphasis supplied).

112. T.R. at 5887 (emphasis supplied).

113. In addition, the letter upon which defendants so heavily rely to establish that the Guinn-Goodson proposal was an "offer"—Guinn's confidential letter to Connally on April 30, 1973 —includes the following language:
[Libya] requests that Hunt bring in representatives to negotiate a participation deal along the lines of Hunt's last proposal presented by Goodson and Guinn.

. . . . .

114. *See* pp. 207–208, 209 supra.

■ While defendants seek to find in the spirit and penumbra of the LPA and subsequent agreements an obligation to coordinate responses and actions, breach of which effected forfeiture of entitlements under the LPA, it is the specific language of paragraph 5 of the LPA that alone controls forfeiture. That paragraph provides for loss of benefits if a party has made an unassented-to offer or agreement "of the kind described in paragraph 1" of the LPA. As already noted, paragraph 1 was initially limited to offers and agreements "with respect to 'government take.'" The subsequent memoranda expanded paragraph 1 to include participation, parity and nationalization. Thus, under all the documents, the forfeiture provision of the LPA was triggered only when an unassented-to offer or agreement was made as to one of these four subjects. Since Hunt's offer was not an offer with respect to participation or the other subjects, it did not work a forfeiture of entitlements under the LPA. There is simply no provision in the LPA for forfeiture based on the making of noncoordinated responses. The point may be a fine one, but it is the specific language of the agreements that is determinative. The Court may not rewrite the agreements for the parties.

■ Furthermore, contrary to defendants' claim, the Memorandum of Intent *imposed no obligation* upon the parties to coordinate responses to participation demands. The language relied upon by the defendants is hortatory. The Memorandum of Intent only expressed the companies' *"wish* to consider collectively" responses to participation demands and *"recommend[ed]* that [the companies] take coordinated actions." (emphasis supplied) Significantly, while the Memorandum of Intent, like the LPA, provided that a party may take or refrain from taking any action in response to government demands, unlike the LPA, it contained no provision for forfeiture for such action.

Comparison of the Memorandum of Intent with the Memorandum of Confirmation, which were executed the same day, further undermines the defendants' position. The Memorandum of Confirmation, signed by the parties to the LPA, explicitly addressed the Libyan situation, bringing the participation and parity Resolutions within the LPA's purview. The Memorandum of Intent, on the other hand, did not incorporate the LPA by reference and concerned general negotiations between the oil companies and the members of OPEC. It was, in effect, a supplement to the Message to OPEC of January 1971 and was signed by several companies who operated in the Persian Gulf but who were not signatories to the LPA. Thus, the Memorandum of Intent cannot be said to be related to the specific forfeiture provision of the LPA.

Based on the foregoing, the Court holds that the defendants have failed to sustain their burden of proof that the plaintiffs' secret offer was an offer of agreement with respect to participation or that their offer was a noncoordinated response that automatically disentitled Hunt to the benefits of the LPA. While the offer and its concealment violated the spirit of the LPA, it does not come within the proscription of the relevant provisions of the agreement and the subsequent memoranda.[115]

### Counterclaim for Rescission

Defendants assert a separate counterclaim for rescission based on fraudulent inducement. They allege that Hunt, at the time of the extension of the LPA on November 21, 1972, had the intention of making the secret offer which it failed to disclose and that had the defendants known of the intention they would not have agreed to the extension. The claim of fraudulent inducement does not depend upon a finding that the offer was "with respect to participation"; it does depend upon plaintiffs' state of mind at the time of the signing of

---

115. *See Deyo v. Hudson,* 225 N.Y. 602, 611, 122 N.E. 635 (1919) ("Remedial liability depends upon the existence of a legal duty, binding upon [a party] and unfulfilled by him. Judged by their obliquity, men's actions may be regarded by their fellow men as sins or vices, but the civil law considers only whether they are actionable.")

the Supplement. Defendants must establish that plaintiffs then had the intention, which they concealed from defendants, to make the offer and that such concealment induced the defendants to extend the LPA to their injury.[116]

There is credible testimony that the defendants would not have agreed to an extension of the LPA if they had known that Hunt intended to make the offer to the Libyan government to sell the concession. The issue remains, however, whether at the time of the signing of the extension, November 21, 1972, Hunt had the intention to make the offer.

It is true, as defendants assert, that the idea of a sale of the concession had been discussed by Hunt officials since at least early 1972 and twice plaintiffs had requested one of their top advisors to make such an offer. Furthermore, during the period after the first Libyan participation demands were made to Hunt in October 1972 up until the signing of the Supplement to the LPA, a continuous series of meetings were held in Dallas at which senior Hunt personnel discussed a number of possible strategies and courses of action. The Court finds that the sale offer was discussed at this time.

■ Yet the evidence is insufficient to support a finding that in fact a definitive determination to make the offer had been made by November 21. Rather, it is more likely than not, and the Court so finds, that it was not until after the session with the Libyans on November 23, when Guinn and Goodson agreed to return with a proposition on December 6, that plaintiffs decided to present to the Libyans the offer to sell the entire concession. Defendants have not carried their burden of proof [117] to establish that Hunt had the present but undisclosed intention on November 21, 1972 to make the sale offer which in fact was made on December 6. Accordingly, the counterclaim for rescission is dismissed.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Submit proposed judgment returnable within ten days from date on five days' notice to the parties.

### Appendix

Recent events in petroleum exporting countries have raised serious questions as to the stability of oil supply at reasonable cost and as to the contractual arrangements under which such supply is assured. Such stability has been recognized by the governments of the United States and other oil consuming nations as vital to their mutual security. These recent events include unilateral demands for changes in agreed arrangements and concerted action on the part of exporting countries in support of such unilateral demands, including threatened interruptions of supply. In these circumstances, individual companies find themselves unable to conduct meaningful negotiations.

---

**116.** Traditionally fraud has been defined as "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party to induce them to act upon it, causing injury." *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969). New York courts have long recognized that silence may constitute a fraud where one party knows that the defrauded party is acting upon a mistaken belief as to a material fact. *Donovan v. Aeolian Co.,* 270 N.Y. 267, 271, 200 N.E. 815, 816 (1936) ("Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent"); *see Bank v. Board of Educ.,* 305 N.Y. 119, 133–34, 111 N.E.2d 238 (1953); *Amend v. Hurley,* 293 N.Y. 587, 596, 59 N.E.2d 416 (1944)

(quoting *Peoples' Bank v. Bogart,* 81 N.Y. 101, 107 (1880)); *W_____ v. B_____,* 17 Misc.2d 432, 435–36, 183 N.Y.S.2d 258, 261 (Sup.Ct. 1958). It is equally well established that an intention may be a material fact. *Adams v. Gillig,* 199 N.Y. 314, 92 N.E. 670 (1910), *cited with approval in Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 39, 280 N.E.2d 867, 871 (1972).

**117.** The standard of proof necessary to establish fraud has been variously described by the New York state courts. *See, e. g., Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 39, 280 N.E.2d 867, 871 (1972) ("[F]raud must be made out by 'satisfactory' or 'clear and convincing' evidence . . . .") Suffice it to say that defendants have not met their burden, however stated.

Each party recognizes and affirms that it is entering this agreement of its own free will and pursuant to its own individual judgment as to its own best interests.

Each party recognizes that if it should stand firm in refusing the demands of the Libyan Government, it might suffer serious financial consequences which would not be fully alleviated by the limited mutual self-help provisions of this agreement.

Nevertheless, each party agrees that in view of the substantial benefits expected to be derived by it from this agreement, it is prepared to participate herein.

In light of these most serious circumstances it is agreed as follows:

1. Until December 31, 1973, each of the parties declares its intention not to make any agreement or offer of agreement with the Libyan Government with respect to "government take" as applied to crude oil without the assent of the other parties hereto; it is furthermore the intention of the parties that they will endeavor, before making any agreement with the Libyan Government, to include a requirement that the Libyan Government accept an offer on comparable terms, adjusted for basic differences in applicable agreements as they now stand, from all other concessionaires; provided, however, that nothing contained in this paragraph 1 shall obligate any company to take or refrain from taking any action if to do so would, in its opinion, be contrary to its vital interests.

2. If after January 8, 1971, the Libyan production of any party or parties is cut back as a result of Libyan Government action below the average daily level prevailing in December 1970, all of the parties will share such cutback or cutbacks during the period thereof but not beyond December 31, 1973, in accordance with the following:

(a) Except as provided in paragraph 2(e), 3 and 4 below, an obligation of a party shall be limited to the supply of Libyan crude oil from its Libyan production at cost f.o.b. Libyan port.

(b) During 1971, 100% of such cutback or cutbacks then in effect shall be shared on a basis proportionate to the respective shares of the parties of total Libyan production in the last full calendar month preceding the effective date of the first cutback after January 8, 1971.

(c) During 1972, 80% of such cutback or cutbacks then in effect shall be shared in each calender quarter on a basis proportionate to the respective shares of the parties of total Libyan production in the next preceding calendar quarter, provided that for this purpose a party shall be deemed to have produced the amount of any cutback applied to it.

(d) During 1973, 60% of such cutback or cutbacks then in effect shall be shared in each calendar quarter on a basis proportionate to the respective shares of the parties of total Libyan production in the next preceding calendar quarter, provided that for this purpose a party shall be deemed to have produced the amount of any cutback applied to it.

(e) If a party has Libyan crude production and has an obligation to supply Libyan crude to another party or parties under this paragraph, but the supplier is prevented from supplying Libyan crude to such party or parties because of Libyan Government restrictions, the supplier shall be obligated, unless restrictions by other governments intervene, to supply, on a barrel-for-barrel basis, Persian Gulf crude selected by the supplier at cost f.o.b. source for delivery to the pre-existing European and Western Hemisphere customer commitments and renewals thereof of the party or parties cutback with freight at AFRA Large Range 2 applicable to the monthly period in which delivery is made equalized between such source and the Libyan port; provided that the supplier shall have the option to provide in substitution for freight equalization the actual transportation needed to move such Persian Gulf crude from its supply

source to the pre-existing European or Western Hemisphere customer, less that required to move Libyan crude to such pre-existing customer.

3. During any sharing program under paragraph 2 or a total shutdown of the parties' production in Libya, those of the parties with Persian Gulf production in excess of 150,000 barrels per day (the "Persian Gulf Producing Parties") shall further be obligated to supply Middle East crude at cost, f.o.b. Persian Gulf loading ports to the parties other than the Persian Gulf Producing Parties ("Non-Persian Gulf Producing Parties") to meet commitments to pre-existing European and Western Hemisphere customers or renewals thereof in amounts equal to the difference between any party's Libyan production in the last full calendar month preceding the effective date of the first cutback after January 8, 1971 and its Libyan crude availability after all adjustments under paragraph 2; provided that such total obligation of the Persian Gulf Producing Parties shall be subject to a maximum in 1971 of 1,500,000 barrels per day, in 1972 of 1,125,000 barrels per day, and in 1973 of 750,000 barrels per day, in each case less the number of barrels of crude oil supplied by the Persian Gulf Producing Parties to the Non-Persian Gulf Producing Parties in such year pursuant to paragraph 2.

4. In respect of each barrel of Persian Gulf crude oil a party is obligated to supply but has not supplied under paragraph 2(e) or 3:
 (a) Such party shall have the option to elect to pay 10 cents; provided if such option is elected it shall apply pro rata as to every party to whom such Persian Gulf Producing Party has such an obligation;
 (b) Such party shall have the obligation to pay said 10 cents if it is prevented from delivering such barrels by an act of the Government having jurisdiction and in each case such payment shall constitute a full and complete discharge of such party's obligations under such paragraph. Without in any way modifying, limiting or conditioning its legal right to

exercise the option set forth above in paragraph 4(a), and it being expressly understood that the exercise of such option shall give rise to no claim other than that for payment of the amounts due under paragraph 4(a), each of the Persian Gulf Producing Parties states that its present intention is to supply Persian Gulf crude oil in discharge of its obligations under paragraphs 2(e) and 3.

5. If prior to December 31, 1973 a party makes an offer of an agreement or makes an agreement with the Libyan Government of the kind described in paragraph 1, without the assent of the other parties, it shall thereupon cease to be entitled to any of the benefits, but shall not be relieved of the obligations provided in paragraphs 2 and 3.

6. All obligations assumed hereunder shall be subject to force majeure except to the extent provided specifically to the contrary herein. Force majeure includes without limitation acts of God and acts of Sovereigns.

7. The Persian Gulf Producing Parties shall share the obligations defined in paragraph 3 on a basis to be agreed upon by them.

8. (a) "Cost" means tax-paid cost adjusted for retroactivity, if any.
 (b) "Cutback" as to any party shall mean a reduction in production resulting from Libyan Government action for whatever reason and shall mean the sum of I and III or II and III:
 I. In 1971 such party's average daily production in December, 1970 less the amount of such party's actual average daily production as permitted by the Libyan Government;
 II. In 1972 and 1973, the lesser of—
 (i) Such party's average daily production in December, 1970 less the amount of such party's actual average daily production as permitted by the Libyan Government in the quarter for which the cutback is being determined; and
 (ii) Such party's average daily production in the quarter preceding

the quarter in which such party's cutback or cutbacks then in effect were first applied less the amount of such party's actual average daily production as permitted by the Libyan Government in the quarter for which the cutback is being determined.

 III. Production of such party voluntarily shut in by such party where such production has become uneconomic because of cutbacks required by the Libyan Government.

(c) "Production" means crude oil exportable by the producer.

9. (a) Each party hereto covenants that it will not assert any claim against any other party or parties arising out of this agreement, except claims for non-performance of this agreement.

(b) Each party hereto waives any claim to the recovery of consequential damages for breach of this agreement.

(c) Each party agrees that the maximum damages recoverable by any party claiming non-performance of an obligation to deliver Libyan crude oil under paragraph 2 hereof shall be 25 U.S. cents times the number of barrels of Libyan crude oil which such party claims it was entitled but failed to receive hereunder.

(d) Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

10. This agreement consists of the entire agreement of the parties; there are no oral promises, representations or warranties.

11. (a) This agreement shall come into effect when both of the following have occurred:

 (i) Signature by BP, Gulf, Jersey, Mobil, Shell, Socal and Texaco.

 (ii) Advice has been received by the parties hereto from John J. McCloy that he has advised the State Department of this agreement and they have interposed no objection and have expressed support in principle and, further, that he has advised the Department of Justice of this agreement and it has stated in writing that it has no present intention of instituting any proceeding under the antitrust laws with respect to the making or performance of this agreement.

(b) The parties hereto undertake to use best efforts promptly to notify each person or company now holding Libyan Petroleum Concessions of the opportunity to accede to this agreement as provided hereinafter. Accession to this agreement shall be open to any other person or company which holds a Libyan Petroleum Concession until the earlier of January 30, 1971 or the date immediately prior to the date on which such company enters into or continues discussion with the Libyan Government after January 15, 1971 regarding the matters described in paragraph 1.

12. The parties hereto, except The British Petroleum Limited, Gelsenberg, A.G., Shell Petroleum Company, Ltd., and Shell Petroleum Maatschappij, agree to make such reports concerning the matters covered by this agreement as the Attorney General or the Secretary of State of the United States may request.

13. Any other provision to the contrary notwithstanding, this agreement shall terminate (a) upon receipt of advice from the Attorney General of the United States that the agreement in operation adversely affects the domestic or foreign commerce of the United States, or (b) upon receipt of advice from the Secretary of State and the Attorney General of the United States that circumstances have so changed that such agreement is no longer in the public interest. Provided that as to any party whose Libyan concession or property has been expropriated as a direct result of action taken by such party pursuant to this agreement, the obligations nevertheless of all other parties to such party as provided herein shall continue until the three year period provided for herein shall have expired, unless the

Secretary of State and Attorney General shall otherwise determine.

This agreement may be executed by the person or corporation holding a Libyan Petroleum Concession and/or by a parent, direct or indirect, of such corporation. In the latter event such parent undertakes to cause the Libyan Petroleum Concession holder in which it has an interest to perform this agreement and to take all action necessary to carry out the terms thereof.

January 15, 1971

Amerada Petroleum Corp. of Libya

By: A. T. Jacobson

Atlantic Richfield Company

By: J. A. Simmons

The British Petroleum Co. Ltd.

By: D. F. C. Steel

Continental Oil Co.

By: John E. Kircher

Gelsenberg A. G.

By: Schubert

Grace Petroleum Corp.

By: E. L. Farrell, Jr.

Gulf Oil Corporation

By: A. R. Martin

Marathon Oil Company

By: J. R. Donnell

Nelson Bunker Hunt

By: Nelson Bunker Hunt

Mobil Oil Corporation

By: H. C. Moses

Occidental Petroleum Co.

By: William Bellano

Shell Petroleum Co. Ltd. & Shell Petroleum Maatschappij

By: Brian A. Carlisle

Standard Oil Co. of Calif.

By: Mac L. Parkhurst

Standard Oil Co. (N.J.)

By: Charles J. Hedlund

Texaco Inc.

By: A. C. Decrane, Jr.

------------------------

By: --------------------